## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID HICE, JOSEPH MOORE, and CHRISTINA BARLOW, individually, and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>EQT CORPORATION, a Pennsylvania corporation, EQT PRODUCTION COMPANY, a Pennsylvania corporation, and BEUSA HOLDINGS INC., a Delaware corporation,<br><br>      Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs David Hice, Joseph Moore, and Christina Barlow (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action against Defendants EQT Corporation, EQT Production Company, and Beusa Holdings Inc. (collectively, "Defendants"), and in support thereof allege as follows.

### I.      NATURE OF THE ACTION

1.      On June 19, 2022, Defendants' oil and gas operations caused a "Frac-Out" incident, where a hydraulically fractured well owned and operated by Defendants injected hazardous chemicals and industrial waste into the water supply of surrounding residents.

2.      Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the Frac-out, caused surrounding residents and their property to be exposed to hazardous gases, chemicals, and industrial waste, and caused damage to the natural resources of the environment, including contaminating the drinking water supply. Residents have suffered significant damages, including increased risk of serious health issues, loss of use and enjoyment of their property, diminution in value, loss of quality of life, and other damages.

3.      Plaintiffs bring this class action, individually and on behalf of those similarly situated, to remedy the environmental contamination and polluting events caused by Defendants' negligent gas drilling operations, seeking compensatory damages, punitive damages, and injunctive relief, including future medical monitoring for the residents affected by the Frac-out.

## II.      PARTIES

4.      Plaintiff David Hice is, and at all material times mentioned herein was, an adult individual residing in Greene County, Pennsylvania.

5.      Plaintiff Joseph Moore is, and at all material times mentioned herein was, an adult individual residing in Greene County, Pennsylvania.

6.      Plaintiff Christina Barlow is, and at all material times mentioned herein was, an adult individual residing in Greene County, Pennsylvania.

7.      Defendant EQT Corporation ("EQT Corp."), at all material times mentioned herein, is and was a Pennsylvania corporation regularly doing business in Pennsylvania, with its principal place of business located at 625 Liberty Avenue, Pittsburgh, Pennsylvania 15222.

8.      Defendant EQT Production Company ("EQT Production"), at all material times mentioned herein, is and was a Pennsylvania corporation regularly doing business in Pennsylvania, with its principal place of business located at 625 Liberty Avenue, Pittsburgh, Pennsylvania 15222.

9.      Defendant Beusa Holdings Inc. ("Beusa"), upon information and belief, at all material times mentioned herein, is a Delaware corporation, with its principal place of business located at 1780 Hughes Landing Blvd., Suite 100, The Woodlands, Texas 77380.

10.     Defendants EQT Corp. and EQT Production are hereinafter collectively referred to as "EQT." EQT Production is a wholly-owned subsidiary of EQT Corporation. Upon information and belief, EQT Corp. and EQT Production are closely interrelated business entities which share office space, corporate office holders and/or board members, and business interests.

11.     Upon information and belief, at all material times hereto, Defendants EQT Corp., EQT Production, and Beusa were the agent, employee, partner, co-venturer, and/or co-conspirator of each of the other Defendants, and, in doing the acts herein alleged, were acting within the course and scope of such agency, employment, partnership venture and/or conspiracy, each with the permission, consent and/or ratification of the other Defendants.

12.     Upon information and belief, at all material times hereto, Defendants, conducted business in the Commonwealth of Pennsylvania, acting in their individual corporate capacities as well as by and through its unincorporated divisions and departments, its corporate parents, subsidiaries and/or other affiliates, its alter ego corporations and other entities, its predecessors and/or its successors.

### III.    JURISDICTION AND VENUE

13.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d) of the Class Action Fairness Act because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are at least 100 members of the proposed Class, and at least one member of the proposed Class is a citizen of a different state from one of the Defendants.

14.     This Court has personal jurisdiction over Defendants EQT Corporation and EQT Production Company, because Defendants are incorporated under the laws of Pennsylvania, Defendants' principal place of business is in this District, Defendants regularly conduct business in this District, and the transactions, events, acts, and/or omissions that form the basis of this Complaint occurred in this District.

15.     This Court has personal jurisdiction over Defendant Beusa Holdings Inc., because it regularly conducts business in this District, and the transactions, events, acts, and/or omissions that form the basis of this Complaint occurred in this District.

16.     Venue is proper in the Western District of Pennsylvania because a substantial part of the acts giving rise to Plaintiffs' claims occurred in the District, and Defendants EQT Corporation and EQT Production Company's principal place of business is located in this District.

## IV.    PLAINTIFFS' FACTUAL ALLEGATIONS

17.     EQT Corporation is an oil and gas production company with operations focused in the Appalachian Basin. EQT holds itself out as the "largest producer of natural gas in the United States" with natural gas and oil reserves across approximately 2.1 million gross acres as of December 31, 2023, reporting annual revenue of approximately $ 7.5 billion in 2022.

18.     EQT owns and operates numerous natural gas wells in Greene County, Pennsylvania, including wells on the Lumber well pad and Spleen Splitter well pad (the "Subject Wells" or "Wells") in Springhill Township.

19.     Plaintiffs and Class Members are residents of the area surrounding Defendants' Lumber and Spleen Splitter well pads, who rely on private water wells for drinking and other daily residential uses.

**A.  Hazardous Waste in Oil and Gas Fracking Operations**

20.     EQT uses a drilling process known as hydraulic fracturing or "fracking," which generally involves the injection of more than a million gallons of fracking fluid, consisting of hazardous chemicals, sand, and water, at high pressure into wells horizontally drilled below the surface, in order to extract the gas contained in underground shale formations.

21.     The pressurized mixture causes the shale layer to crack, and these fissures are held open by the sand particles so that natural gas from the shale can flow up the well.

22.     The composition of fracking fluid includes hazardous chemicals that are known or reasonably anticipated to be toxic to humans.

23.     In addition to the hazardous chemicals, contaminants such as gas, oil, brine, heavy metals and radioactive substances, which are naturally present in rock formations, are dislodged and caused to flow back from wells during drilling and production operations "Flow Back Fluid".

24.     In 2016, the United States Environmental Protection Agency (EPA) reported:

> Spills of hydraulic fracturing fluids have occurred across the county and have affected the quality of drinking water resources…Spills may infiltrate drinking water resources by reaching surface water or by leaching into the groundwater. [1]."

25.     In addition, the EPA reported:

> Potential human health hazards associated with chronic oral exposure to these chemicals include cancer, immune system effects, changes in body weight, changes in blood chemistry, cardiotoxicity, neurotoxicity, liver and kidney toxicity, and reproductive and developmental toxicity.

*Id.* at ES-43.

---

[1] U.S. Environmental Protection Agency, 2016 Report, *Hydraulic Fracturing for Oil and Gas: Impacts from the Hydraulic Fracturing Water Cycle on Drinking Water Resources in the United States,* Office of Research and Development, Washington D.C. EPA/600/R-16/236Fa (available at https://cfpub.epa.gov/ncea/hfstudy/recordisplay.cfm?deid=332990, last accessed June 15, 2024).

26.     The Pennsylvania Department of Environmental Protection ("PA DEP") has reported nearly 400 confirmed cases of impacts to underground water supplies impacted by oil and gas activities since 2007.

**B.   EQT's Operations Caused a "Frac-Out" Releasing Fracking Fluid into the Water Supply of Residents in the Surrounding Area.**

27.     EQT owns and operates the Lumber 13H oil and gas well (the "Lumber 13H Well") on the Lumber well pad.

28.     Beusa, upon information and belief, serves as the fracking company for both the Lumber and Spleen Splitter well pads.

29.     The Lumber 13H Well is located approximately 6,500 feet from an abandoned well identified as the Fox Hill No. 1 well (the "Fox Hill Well").

30.     On or about June 19, 2022, EQT's operations on the EQT Lumber well pad caused a communication incident with the Fox Hill Well (the "Frac-Out"), where fracking fluid and other substances were released into groundwater aquifers. *See* **Exhibit A**, a true and correct copy of the publicly available Pennsylvania Department of Environmental Protection ("DEP") Inspection Report dated June 23, 2022 regarding the Frac-out incident; **Exhibit B**, a true and correct copy of the publicly available DEP Inspection Report, dated July 21, 2022 regarding the Frac-out incident.

31.     The Frac-out caused the fracking and flow back fluid to blow through the ground surrounding the Fox Hill Well, resulting in a geyser on a resident's property, which was observed by several witnesses, including EQT's agents and employees, and videorecorded.

32.     Immediately after the Frac-out was observed, EQT, upon information and belief, paused and then restarted fracking operations on the Lumber well pad while observing the Fox Hill Well, which resulted in the highly pressurized fracking fluid, gas, and water to spew out,

confirming the communication between the Lumber Well and Fox Hill Well. Witnesses reported a loud roaring sound from the Frac-out pressure.

33.    On or around June 19, 2022, EQT and the DEP confirmed that EQT's "hydraulic fracturing operations on the Lumber well site communicated to an offset well [the Fox Hill Well]," and that "EQT personnel observed fluid and gas expressing from the offset well." *See* **Exhibit A**.

34.    The DEP Inspection Report noted that EQT was in violation of 25 Pa. Code Section 78a.73, for failing to notify the DEP of the Frac-out and for continuing operations on the Lumber well pad "after the communication incident was confirmed." *See* **Exhibit A**.

35.    The DEP "requested EQT cease all hydraulic fracturing operations on June 21, 2022." *See id.*

36.    At the time of the Frac-out, upon information and belief, EQT was hydraulically fracking multiple wells on the Lumber well pad simultaneously, including without limitation, Lumber wells 1H, 5H, 13H, and 15H.

37.    The DEP stated that on June 21, 2022, the DEP sampled the water supply of the individual who resided on the property where the Fox Hill Well was located for general chemistry, total metals, and methane/ethane/propane analysis. *See id.*

38.    On July 21, 2022, the DEP inspected the abandoned Fox Hill Well and noted that "additional methane/ethane/propane samples were collected at the landowner's water supply." *See* **Exhibit B**.

39.    The DEP noted in a subsequent Inspection Report that "[a]s a result of the hydraulic fracturing communication incident on June 19, 2022, the Department is currently investigating seventeen water supply complaints and two stray gas migration incidents." *See* **Exhibit C** attached hereto, a true and correct copy of the publicly available DEP Inspection report, dated November,

21, 2022. Upon information and belief, the DEP subsequently received and investigated numerous additional complaints involving the Frac-out.

40.     In February 2023, EQT attempted to plug the Fox Hill Well and reported to the DEP that "10 gallons of well-bore fluid was released off containment due to a plugging rig failure." While pulling tubing from the Fox Hill well bore, the swivel hose at the top of the rig pumping water broke causing the hose to spray water off the side of the containment downslope from the well site and into a stream named Fork Fish Creek. *Id.*

**C.  <u>Residents Report Contamination of their Water Supply Since the Frac-out.</u>**

41.     Numerous residents and news publications have reported contamination and issues with the water supply since the Frac-Out.

42.     Prior to the Frack-Out caused by Defendants, upon information and belief, ground water drawn by residents appeared visually clean, contained no visible gases, and did not omit noxious odors.

43.     After the Frac-out, Plaintiffs and other residents reported, without limitation, that their ground water diminished in quality, contained excess sedimentation, appeared black, brown and/or cloudy, and/or emitted odors.

44.     Upon information and belief, water testing revealed the presence of hazardous gases and chemicals, including without limitation, ethane, butane, propane, and surfactants.

45.     Upon information and belief, hazardous chemicals used during EQT's operation of the Lumber well pad include, without limitation, ethane, butane, propane, lubricating agents, barite, gels, surfactants, and defoaming agents.

46.     As a result of these water quality issues, Plaintiffs and residents have been forced to use alternative sources for potable water and must continue monitoring the quality of their water.

47. The issues with residents' ground water continue to date and are anticipated to continue into the future.

48. In and around the Fall of 2022, the DEP mailed letters to residents regarding their investigation of resident complaints regarding their water supply. In the letters, the DEP stated, "[b]ased on information obtained to date, the Department has determined that further investigation is necessary to determine whether the Water Supply has been affected as a result of oil and gas activities… ."

49. EQT conducted sampling and testing of the water supply of certain residents of the area surrounding the Lumber well pad.

50. EQT represented to residents that concerns with the water supply would be remedied.

51. In or about August 2023, EQT's President and CEO Toby Rice represented that residents' issues with the water supply would be addressed by EQT.

52. During this time, EQT agreed to provide water buffalos to affected residences, yet acknowledged that this was "a temporary solution" to the concerns regarding residents' water supply.

53. In and around the Fall of 2023, EQT mailed correspondence to residents stating that "EQT's investigation did not find any evidence that supports a finding of communication between its completions activities at the Lumber well site and the Fox Hill #1 well." Despite the DEP's prior reports of a confirmed communication incident, EQT further stated, "[w]hile EQT's investigation was ongoing, the PA DEP's investigation similarly found that EQT's operations did not impact the water supplies of residents."

54.    In or around November 2023, EQT began offering affected residents the option of installation of a water treatment system or a one year supply of water, in exchange for a release of all claims against Defendants. EQT further required that residents not publicize EQT's offer, or make any statements disparaging EQT and its employees.

55.    EQT informed residents that a meeting with EQT and the water treatment system installer would be held for residents who elect for the installation of a water treatment system.

56.    However, at the January 2024 meeting, upon information and belief, the water treatment installer retained by EQT acknowledged that the proposed water treatment systems could not effectively filter fracking fluid, flow back fluid, or other chemicals and substances from their water, especially in an area where fracking operations were ongoing.

57.    John Stolz, Director of the Center for Environmental Research and Education at Duquesne University, upon information and belief, conducted water testing in the area surrounding the Frac-out and cautioned residents not to drink their water.

58.    In addition, upon information and belief, water testing found concentrations of methane gas above the state's contamination threshold. At high concentrations, methane can migrate out of water and become explosive.

**D.    Despite the Reported Water Contamination Issues, EQT Appealed the DEP's Decisions to Cease Operations and Continued Fracking on the Lumber and Spleen Splitter Well Pads.**

59.    Despite the numerous complaints of water contamination issues after the Frac-out, EQT promptly sought to continue their drilling operations on the Lumber and Spleen Splitter well pads.

60.     In addition, in or around July 2022—less than a month after the Frac-out incident, EQT began sending correspondence to residents stating that it was planning to drill additional gas wells in the area for the Spleen Splitter well pad.

61.     On or about August 10, 2023, the DEP notified EQT that it did not approve continued operations of the wells at the Lumber well pad and Spleen Splitter well pad, and only conditionally approved EQT's controlled injection test for the Lumber 13H Well. The DEP further required that EQT prepare a root cause analysis (RCA) for the Frac-out for the DEP's review prior to a decision on continued operations.

62.     On or about September 22, 2023, EQT filed appeals of the DEP's decisions regarding the Lumber and Spleen Splitter well pads to the Pennsylvania Environmental Hearing Board ("PA EHB"), seeking to continue their oil and gas operations.

63.     Despite video evidence of the Frac-out and numerous reports from residents, EQT asserted that "evidence does not support a finding that there was a communication between any of the Lumber Wells and Fox Hill Well."

64.     In its appeal, EQT asserted that the DEP's decisions amounted to "denying EQT the ability to hydraulically fracture the Spleen Splitter wells that it had drilled," and "imposes significant financial burden on EQT."

65.     On November 29, 2023, EQT and the Department entered into a Joint Stipulation of Settlement.

66.     Under the Settlement, the DEP permitted EQT's continued operations on the Lumber and Spleen Splitter well pads. EQT agreed to continue monitoring its operations and provide to the DEP a list of chemicals used in the fracking fluid.

67.    The Settlement between the DEP and EQT does not include provisions addressing the impacts on the water supply of residents in New Freeport and the surrounding area.

68.    To date, EQT continues their fracking operations in the area of the Frac-out.

69.    As a result of Defendants' conduct, Plaintiffs and surrounding residents have suffered and continue to suffer significant harm from the contamination of their water supply.

### E.  CLASS ACTION ALLEGATIONS

70.    ***Class Definition***: Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this class action on behalf of the following Classes and/or Sub-Classes:

> a.  **The Affected Resident Class:** All United States residents who reside on property located within a 10,500 foot radius of any horizontal or vertical portion of a well bore that originates from the Lumber well pad or Spleen Splitter well pad, between June 19, 2022 and the date of class certification.

71.    ***Subclass Definitions***:  In addition, Plaintiffs bring this action on behalf of a subclass of similarly situated individuals (the "Subclass"), defined as follows:

> a.  **The Property Owner Class:** All United States residents who own real property located within a 10,500 foot radius of any horizontal or vertical portion of a well bore that originates from the Lumber well pad or Spleen Splitter well pad, between June 19, 2022 and the date of class certification.

72.    Collectively, the Affected Resident Class and the Property Owner Class are referred to as the "Class" or "Classes".

73.    Excluded from the Classes are (i) governmental entities, (ii) Defendants and its officers, directors, affiliates, legal representatives, employees, co-conspirators, successors,

subsidiaries, assigns, and entities in which Defendant has a controlling interest, and (iii) the judge, justices, magistrates, or judicial officers presiding over this matter.

74.    Plaintiffs reserve the right to modify, change, re-define, or expand the definitions of the Classes prior to class certification upon discovery and further investigation.

75.    This action is properly maintained as a class action because Defendants have acted or refused to act on grounds that are generally applicable to the proposed Classes, so that final injunctive relief and/or declaratory relief is appropriate with respect to the members of the proposed Classes as a whole.

76.    In addition, this action may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of Rule 23(b)(3). Plaintiffs seek to represent ascertainable Classes, as determining inclusion in the Classes can be done through Defendants' business records, and records of the Pennsylvania Department of Environmental Protection, and/or other governmental agencies.

77.    *Numerosity*: The Class is so numerous that separate joinder of each member is impracticable. Although, the precise number of Class members is unknown and can only be determined through appropriate discovery, upon information and belief, there are at least 100 Class members, so that joinder of all members would be impracticable.

78.    *Commonality*: Questions of law and fact common to the Class exist that predominate over questions affecting only individual members, including but not limited to:

     a.  Whether Defendants are subject to liability under the Pennsylvania Hazardous Site Clean Up Act or related regulations;

     b.  Whether Defendants engaged in reckless, negligent, ultrahazardous, and/or intentional acts and omissions;

    c.   Whether such acts and omissions were a breach of the Defendants' duty of care to Plaintiffs and Class Members;

    d.   Whether such acts and omissions directly and proximately caused water contamination issues affecting Plaintiffs and Class Members;

    e.   Whether Defendants' conduct caused Plaintiffs and Class Members to suffer damages; and

    f.   The proper measure of damages.

79.    ***Typicality:*** Plaintiffs' claims are typical of those brought on behalf of the members of the Classes and/or Sub-Classes. Plaintiffs, like all Class members, suffered damages as a result of Defendants' conduct related to the Frac-out incident, which Plaintiffs allege were the result of negligent, reckless, ultrahazardous, and/or intentional acts and omissions of the Defendants.

80.    ***Adequacy of Representation***: Plaintiffs will fully and adequately represent and protect the interest of the Classes and/or Sub-Classes because the common injuries and interests of the members of the Class and/or Sub-Classes and the singular conduct of Defendants is or was applicable to all members of the Classes and/or Sub-Classes. Plaintiffs have no interests that are contrary or in conflict with those of the Classes and/or Sub-Classes they seek to represent.

81.    Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action suits and consumer litigation.

82.    ***Superiority***: Certification of the Classes is appropriate because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications. Absent a class action, it would be unlikely that many members of the Classes would

be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

83.    A class action is a fair and efficient method of adjudicating the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create.

84.    In the alternative, the Classes should be certified because:

a.    The prosecution of separate actions by the individual members of the proposed class would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for Defendants; and

b.    The prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of the interests of non-party class members or which would substantially impair their ability to protect their interests.

**COUNT I**
**VIOLATION OF HAZARDOUS SITE CLEANUP ACT; 35 P.S. §§ 6020.101 *et seq.*** 
***On behalf of all Classes***

85.    Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

86.    As detailed above, Defendants have caused the spill, release and/or discharge of "hazardous substances" from the Subject Wells, as defined by the Pennsylvania Hazardous Sites Cleanup Act ("HSCA"), 35 P.S. §§ 6020.101 *et seq*.

87.    The locations of the releases of hazardous substances set forth above constitute "sites" as defined by the HSCA.

88.    The spills, releases, and discharges set forth above constitute "releases" of hazardous substances and contaminants under the HSCA.

89.    The spills and discharges of hazardous substances from Defendants' Wells are also threatening the release of hazardous substances into the ground water which Plaintiffs and Class Members draw from.

90.    At all relevant times, Defendants owned and operated the Subject Wells.

91.    Defendants are responsible persons accountable for the release(s) or threatened release(s) of hazardous substances under the HSCA, because they caused the releases, spills, and discharges of combustible gases and hazardous substances that have entered the ground water which Plaintiffs and Class Members draw from.

92.    Defendants have caused, and continue to cause, releases, or substantial threats of releases, of hazardous substances or contaminants that present a substantial danger to the public health or safety or the environment, under the HSCA.

93.    Plaintiffs have incurred and continue to incur reasonable and necessary or appropriate response costs due to the existing and ever threatening contamination of their water supplies, including costs for water sampling and alternative water supplies.

94.    Pursuant to Sections 507, 702 and 1101 of HSCA, 35 P.S. §§ 6020.507, 6020.702 and 6020.1101, Defendants are liable for reasonable and necessary or appropriate costs incurred by Plaintiffs in responding to Defendants releases or threatened releases of hazardous substances and contaminants.

95.    Defendants' releases and threats of releases of hazardous substances and contaminants constitute public nuisances under Section 1101 of HSCA, 35 P.S. § 6020.1101.

96.     Defendants' releases and threats of releases of hazardous substances by Defendants constitute unlawful conduct under Section 1108 of HSCA, 35 P. S. § 6020.1108.

97.     Defendants' releases and threats of releases of hazardous substances and contaminants have caused and threaten to cause personal injuries to Plaintiffs.

98.     As a result of their conduct, Defendants are liable for all response costs, damages, and injuries to Plaintiffs and Class Members proximately caused by the releases and threats of releases of hazardous substances, and to remediate said releases, threats of releases, and the resultant contamination.

## COUNT II
## NEGLIGENCE
### On behalf of all Classes

99.     Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

### Negligence / Gross Negligence

100.     Each Defendant had a duty to conduct oil and gas operations, including the Subject Wells, in a non-negligent manner, and owed Plaintiffs and Class Members a duty of care.

101.     Defendants owed a duty of care to Plaintiffs and Class Members to responsibly drill and operate the Wells and well sites, to prevent releases of hazardous chemicals, and to prevent such releases from contaminating their property and water supply.

102.     Defendants owed a duty of care to Plaintiffs and Class Member to take all measures reasonably necessary to inform and protect the public, including Plaintiffs and Class Members, from the contamination of their water supply and to protect them from exposure to hazardous chemicals and combustible gases.

103.    Defendants owed a duty of care to promptly and truthfully inform Plaintiffs and Class Members of the Frac-out incident and its impacts on the surrounding area and water supply.

104.    Defendants, including their officers, agents, and/or employees, owed a duty of care to Plaintiffs and Class Members because Defendants' operation of the wells and well sites, and the resulting water contamination, is conduct that foreseeably creates an unreasonable risk of harm, or an elevated risk of foreseeable harm, to Plaintiffs and Class Members, their property, and their water supplies.

105.    The laws of Pennsylvania and related regulations impose a duty on Defendants to drill, own, and operate the Wells and well sites in manner that would not jeopardize the health, safety and well-being of Plaintiffs and Class Members, and otherwise to drill, own and operate the wells in such a manner as not to contaminate the water supply of Plaintiffs and Class Members.

106.    Defendants, including their officers, agents, and/or employees knew or in the exercise of reasonable care should have known its operations, including without limitation, resuming their fracking activities after the Frac-out occurred, would result in the release or the threat of release of combustible gases and hazardous chemicals into the water supply of Plaintiffs and Class Members.

107.    Defendants, including their officers, agents, and/or employees knew, or in the exercise of reasonable care should have known, of the dangerous, offensive, noxious, hazardous, and toxic nature of their gas drilling and operations.

108.    Defendants, including their officers, agents, and/or employees knew, or in the exercise of reasonable care should have known, of the dangerous, offensive, hazardous and toxic nature of the combustible gases and hazardous chemicals released by Defendants, and that they

were capable of polluting the water supplies of Plaintiffs and Class Members, damaging their Property, decreasing the value of the Property and otherwise causing natural resource damage.

109.    Defendants, including their officers, agents, and/or employees, should have taken reasonable precautions and measures to prevent or mitigate the releases and spills, including the design and operation of process systems, so that such releases and spills would not occur, as well as adequate planning for any spills, releases or other emergencies.

110.    Defendants, including their officers, agents, and/or employees knew, or in the exercise of reasonable care should have known, that once a spill or release occurred, they should take reasonable measures to protect the public, including without limitation, by issuing immediate and adequate warnings to nearby residents, including Plaintiffs and Class members, to emergency personnel, governmental agencies, and to public officials, and to cease their fracking operations in the area of the Frac-Out.

111.    Defendants, including their officers, agents and/or employees knew, or in the exercise of reasonable care should have known, that the releases caused by their negligent conduct, and the resultant harm to Plaintiffs, Class Members, and their Property, were foreseeable and inevitable consequences of Defendants acts and/or omissions, given the manner in which they engaged in gas drilling and production activities at the Wells and well sites.

112.    Defendants, including their officers, agents, and/or employees, acted unreasonably and negligently in causing the releases and discharges alleged herein and the contamination of Plaintiffs' and Class Members' water supplies.

113.    Defendants, including their officers, agents, and/or employees, acted unreasonably and negligently by failing to take reasonable measures and precautions necessary to avoid and/or

respond to the releases of hazardous chemicals and combustible gases and to protect the public from said hazardous chemicals and combustible gases.

114.    Defendants, upon information and belief, breached their duties owed to Plaintiffs by failing to drill, own, and operate the Wells and well sites, in a manner that comports with established legal and/or industry standards for drillers, owners and operators of gas wells, failed to accurately report the Frac-out and its effects on the surrounding area, and committed other negligent acts related to the Frac-out incident.

115.    Defendants, upon information and belief, failed to drill, own and operate the Wells in accordance with the statutes and environmental regulations of the Commonwealth of Pennsylvania because they have drilled, owned and operated the Wells and well sites, in such a manner as to cause the pollution of the property and water supplies of Plaintiffs and Class Members.

116.    Plaintiffs in no way contributed to the damages and injuries they have sustained.

117.    As a direct and proximate result of Defendants' breach, Plaintiffs and Class members have been damaged, and continue to suffer damages, in an amount to be determined at trial.

### *Negligence Per Se*

118.    Defendants had a duty to comply with applicable laws, regulations and guidelines applicable to drillers, owners and operators of natural gas wells, including but not limited to the Pennsylvania Clean Streams Law, 35 P.S. §§691.1, *et seq*., the Pennsylvania Solid Waste Management Act, 35 P.S. §§ 6018.101, *et seq*., the Pennsylvania Oil and Gas Act, 58 P.S. §§ 601.101, *et seq*.

119.    Defendants, upon information and belief, have failed to conduct their operations, including without limitation operation of the Wells and well sites, in compliance with the applicable laws and regulations relevant to the protection of air, soil and water resources.

120.    For example, on or about June 23, 2022, the DEP issued a permit violation to EQT Production, citing that EQT was in violation of 25 Pa. Code § 78a.73 for (i) failing to notify the DEP of the hydraulic fracturing communication incident, (ii) failing to submit an Area of Review Fracturing Communication Incident Report, and (iii) continuing to hydraulic fracturing operations on an adjacent well after the communication incident was confirmed.

121.    These laws and regulations were enacted and promulgated for the protection of public and private health, safety, property and economic interests.

122.    These laws and regulations impose specific duties on Defendants to drill and operate their Wells in a manner that would not cause the migration of gas or fluids into sources of fresh ground water or otherwise pollute fresh ground water.

123.    Plaintiffs and Class Members are members of the group(s) whose protection was intended by the drafters of such laws and regulations.

124.    Plaintiffs are members of specific subset of the public by virtue of living in such close proximity, of the Lumber well pad and/or Spleen Splitter well pad.

125.    Defendants' statutory and regulatory violations were a direct and proximate cause of the contamination and pollution of Plaintiffs' ground water supply, resulting in substantial damages and imminent, substantial and impending harm to Plaintiffs' Property.

126.    The risk of damages and the imminent, substantial and impending harm to Plaintiffs and Class Members' property and ground water supply are precisely the types of injuries the applicable laws and regulations were designed to prevent.

127.    Violations of these laws and regulations by Defendants thereby constitute per se negligence.

### *Res Ipsa Loquitor*

128.    In addition, or in the alternative, pursuant to the doctrine of res ipsa loquitur, there was a breach of duty by the Defendants, the breach was the proximate cause of Plaintiffs and Class Members' injuries, and negligence by the Defendants can be inferred.

129.    As a direct and proximate result of Defendants' breaches of their duty of care, Plaintiffs and Class Members have been harmed, including but not limited to, increased risk of disease and  medical and health issues; the expense of testing and monitoring the impact on their property and water sources; expense relating to evacuation and/or cleanup of their property and/or drinking water; expenses related to remedial measures taken to ensure safe and clean air and water; damage to property, loss of use and enjoyment of property, and expenses of future medical monitoring.

130.    The amount of damages for the injuries suffered by Plaintiffs and Class Members, including but not limited to the contamination of their water supply, loss of use and enjoyment of their Property, loss of value to their Property, inconvenience and discomfort caused by interference with the peaceful possession of their Property, and others will be established at the time of trial.

131.    Defendants, by reason of their negligence, are jointly and severally liable for all of the injuries to Plaintiffs and Class Members, their property and water supplies proximately caused by the releases and discharges of combustible gases, hazardous chemicals, and industrial wastes indicated herein, and should be required to remediate the contamination caused by such releases.

132.    Defendants' conduct constitutes recklessness, willful and wanton conduct, and/or actual malice, and shows a conscious disregard of the rights and safety of other persons (including

Plaintiffs and Class Members) that has a great probability of causing substantial harm, warranting punitive damages against Defendants.

### COUNT III
### STRICT LIABILITY
### *On behalf of all Classes*

133.    Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

134.    Defendants engaged in abnormally dangerous and ultrahazardous activity, and the Defendants are strictly liable for harm resulting from such activity.

135.    Continuing and/or resuming hydraulic fracking operations in the same area after a Frac-out communication event is an abnormally dangerous and ultrahazardous activity.

136.    The hazardous chemicals and combustible gases used, supplied, processed, and used by Defendants are of a toxic and hazardous nature capable of causing severe personal injuries and damages to persons and property coming in contact with them, and therefore are ultra hazardous and abnormally dangerous.

137.    There is an inherent high degree of risk of some harm to the persons and land of others from continuing fracking operations because the gas drilling techniques used by Defendants involves risks from high pressure areas, mechanical difficulties such as poorly constructed casings, all of which increase the likelihood of releases and discharges of combustible gases, hazardous chemicals, and industrial wastes, particularly where a communication incident has occurred.

138.    Such operations create a high degree of risk of some harm to the person, land or chattels of others. Impacts to water supplies are very common, as can be seen by nearly 400 confirmed cases of impacts to underground water supplies impacted by oil and gas activities reported by the DEP since 2007.

139.    The likelihood that harm will result from this activity is great, as resuming fracking activities after a communication event will likely result in the subsequent release of chemicals, gases, and substances that will harm surrounding properties and populations.

140.    There is an inability to fully eliminate the risks associated with hydraulic fracturing by the exercise of reasonable care, after a Frac-out has occurred.

141.    Hydraulic fracturing operations are strictly regulated by the government, and resuming fracking operations in an area where a communication event occurred is not an activity that is commonly engaged in.

142.    Hydraulic fracturing after a Frac-out incident is an inappropriate activity to conduct in the community where Plaintiffs and Class Members reside, particularly where a communication incident has occurred and water contamination issues have been reported.

143.    As a result of Defendants' deep drilling and hydraulic fracturing operations at the Wells and well sites, hazardous chemicals and substances have been released and discharged by Defendants and have leached into the soil and water supply of Plaintiffs and Class Members.

144.    The dangerous attributes of continuing hydraulic fracturing operations after a communication event has occurred, outweigh the value to the local community.

145.    The kind of harm suffered by Plaintiffs, which includes but is not limited the contamination of their water supply, is within the scope of the abnormal risk created by Defendants' gas drilling and operations of the Wells and the well sites.

146.    The harm suffered by Plaintiffs and Class Members, including the resultant water contamination, are not due to the abnormally sensitive character of any activity of Plaintiffs or Class Members.

147.    Defendants, by engaging in abnormally dangerous and ultra hazardous activities, are strictly liable for the harm suffered by Plaintiffs and Class Members resulting from Defendants' operations, and to remediate the contamination.

148.    As a result of the Defendants' actions and omissions, Plaintiffs and Class Members have been harmed, including but not limited to, increased risk of medical and health issues, the expense of testing and monitoring the impact on their property and water sources; expense relating to evacuation and/or cleanup of their property and/or drinking water; expenses related to remedial measures taken to ensure safe and clean air and water; damage to property, loss of use and enjoyment of property, inconvenience and discomfort, and expenses of future medical monitoring.

149.    Defendants' conduct constitutes willful and wanton conduct and actual malice, and shows a conscious disregard of the rights and safety of other persons (including Plaintiffs and Class Members) that has a great probability of causing substantial harm, warranting punitive damages.

**COUNT IV**
**PRIVATE NUISANCE**
*On behalf of all Classes*

150.    Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

151.    Defendants, by their acts and/or omissions, including those of their officers, agents, and/or employees have caused an unreasonable and substantial interference with the right of Plaintiffs and Class Members to use and enjoy their Property.

152.    Defendants, including their officers, agents and/or employees have created and maintained a continuing nuisance in the area of the Wells, by allowing the Wells to operate in a dangerous and hazardous condition, allowing the releases and/or the threats of releases of

hazardous chemicals and combustible gases, and allowing the releases to continue to spread to surrounding areas including residential property and drinking water supplies, resulting in injuries to the property interests of Plaintiffs and Class Members.

153.    Defendants, as owners and operators of the Wells and well sites, control the well sites and any spills, releases and discharges therefrom.

154.    Defendants have or had the ability and means to control the spills, releases and discharges originating from their Wells and well sites.

155.    Defendants' invasions of the property interests of Plaintiffs and Class Members are intentional and unreasonable in that Defendants knew their drilling and operations of the Wells and well sites was substantially certain to result in the discharge of various substances, combustible gasses, hazardous chemicals, and industrial wastes, into the water supply and property of Plaintiffs and Class Members.

156.    In addition, or in the alternative, Defendants' invasions are unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

157.    Fracking operations after the occurrence of a Frac-out are considered an abnormally dangerous activity and/or create abnormally dangerous conditions.

158.    Defendants have created and perpetuated a continuing nuisance on the property of Plaintiffs and Class Members by drilling and operating the Wells and well sites in such a manner that has caused releases and discharges of combustible gases, hazardous chemicals, and industrial wastes and by allowing these releases and discharges to continue to contaminate their property and water supply, resulting in injuries to the property interest of Plaintiffs and Class Members in the private use and enjoyment of their property.

159.    Defendants' conduct has resulted in a material interference with the ordinary comfort of the lives of Plaintiffs and Class Members, impairing the reasonable enjoyment of their habitation, and invading their private use and enjoyment of their property.

160.    The water contamination and issues continue to this day and are likely to continue into the future, significantly impacting the right to the use and enjoyment of their property.

161.    Defendants have caused substantial inconvenience and discomfort to Plaintiffs and Class Members by interfering with their peaceful possession and enjoyment of their property.

162.    Defendants are jointly and severally liable for all of the damages and injuries to Plaintiffs and Class Members proximately caused by the releases and discharges of combustible gases, hazardous chemicals, and industrial wastes into their water supply and property, and should be required to eliminate, remediate and/or substantially mitigate the water contamination caused by their gas drilling and operation activities.

163.    As a result of the private nuisance, Plaintiffs and Class Members were harmed, including but not limited to, suffering physical and emotional injuries, increased risk of disease, and expenses of future medical monitoring.

164.    Defendants' conduct constitutes willful and wanton conduct and actual malice, and shows a conscious disregard of the rights and safety of other persons, including Plaintiffs and Class Members, that has a great probability of causing substantial harm, warranting punitive damages.

**COUNT V**
**PUBLIC NUISANCE**
***On behalf of all Classes***

165.    Plaintiffs incorporate by reference the allegations set forth in the previous paragraphs above as though fully set forth herein.

166.    Defendants' operations and resulting release of toxic, hazardous, and dangerous chemicals and materials into the water supply resulted in a public nuisance.

167.    The release and spread of these chemicals and materials was an unreasonable and significant interference with rights common to the general public, including public health, public safety, public peace, public comfort, public convenience, and the right to clean water.

168.    The release and spread of these chemicals and materials has produced a permanent and/or long-lasting effect.

169.    This public nuisance also interfered with Plaintiffs' and Class Members' rights to use and enjoy their property.

170.    This was a significant harm, involving more than slight inconvenience.

171.    This harm was of greater magnitude and of a different kind than that which the general public suffered.

172.    This invasion was the direct and proximate result of Defendants' negligent conduct, intentional, reckless conduct, and/or abnormally dangerous activities or conditions.

173.    As a result of this public nuisance, Plaintiffs and Class Members have been harmed, including but not limited to, increased risk of medical and health issues, the expense of testing and monitoring the impact on their property and water sources; expense relating to evacuation and/or cleanup of their property and/or drinking water; expenses related to remedial measures taken to ensure safe and clean air and water; damage to property, loss of use and enjoyment of property, inconvenience and discomfort, and expenses of future medical monitoring.

174.    Defendants' conduct constitutes willful and wanton conduct and actual malice, and shows a conscious disregard of the rights and safety of other persons, including Plaintiffs and Class Members, that has a great probability of causing substantial harm, warranting punitive damages.

## COUNT VI
## FUTURE HEALTH MONITORING
### *On behalf of all Classes*

175.    Plaintiffs incorporate by reference the allegations set forth in the previous paragraphs above as though fully set forth herein.

176.    Defendants' operations resulted in the release of proven hazardous substances into the surrounding surface soil, surface water, and groundwater, which contaminated the property of Plaintiffs and Class Members.

177.    Upon information and belief, these substances include but are not limited to methanol, petroleum distillates, hydrochloric acid, isopropanol, methane, ethane, butane, propane, biocides, lubricating agents, barite, acids, gels, surfactants, defoaming agents, and other hazardous substances.

178.    As a result, Plaintiffs and Class Members were exposed to greater-than-normal background levels of these chemicals and materials.

179.    As a proximate result of these exposures, Plaintiffs and Class Members have a significantly increased risk of contracting one or more serious latent diseases and other health issues.

180.    Monitoring procedures exist that make the early detection of these serious latent diseases possible.

181.    These monitoring regimes are different than those normally recommended in the absence of such exposures.

182.    These monitoring regimes are reasonably necessary to protect the Plaintiffs and Class Members according to contemporary scientific principles.

183.    Plaintiffs request that the Court establish a medical monitoring program, managed by court-appointed and court-supervised trustees, whereby Plaintiffs and Class Members will be monitored by physicians, and the medical data produced utilized for epidemiological or other scientific studies.

184.    Establishing a Court-supervised, managed, medical monitoring program will ensure that funds are reserved, available, and used for medical monitoring, scientific studies, and related activities, the details of which are to be determined by the Court after being advised by experts the Court deems appropriate.

185.    Alternatively, Plaintiffs and Class Members should be awarded the quantifiable costs of such a monitoring program for the Plaintiffs and Class Members to undertake.

186.    Defendants' conduct constitutes willful and wanton conduct, and actual malice, and shows a conscious disregard of the rights and safety of other persons that has a great probability of causing substantial harm, warranting punitive damages.

## COUNT VII
## TRESPASS
### *On behalf of all Classes*

187.    Plaintiffs incorporate by reference the allegations set forth in the previous paragraphs above as though fully set forth herein.

188.    As a result of Defendants' operations, chemicals, materials, and byproducts have invaded and continue to invade the property of Plaintiffs and Class Members, and have interfered with their possession, use, and enjoyment of their property.

189.    These actions constitute a trespass, including a continuing trespass, on their property.

190.    As a direct and proximate result of this trespass, Plaintiffs and Class Members have been harmed. The amount of damages for the injuries suffered by Plaintiffs and Class Members, will be established at the time of trial.

191.    Defendants' conduct constitutes willful and wanton conduct, and actual malice, and shows a conscious disregard of the rights and safety of other persons that has a great probability of causing substantial harm, warranting punitive damages.

## COUNT VIII
## FRAUDULENT MISREPRESENTATION
### *Individual Plaintiffs Against Defendants EQT Corporation and EQT Production Company*

192.    Plaintiffs incorporate by reference the allegations set forth in the previous paragraphs above as though fully set forth herein.

193.    EQT fraudulently and/or intentionally misrepresented to Plaintiffs that there were no adverse impacts from the Frac-out, and that a communication incident did not occur.

194.    EQT made false representations, including without limitation, through correspondence and communications from its agents that: (i) a communication event did not occur between the Lumber well pad and Fox Hill well, (ii) that appropriate testing and monitoring was being conducted, (iii) that the DEP confirmed that a communication event did not occur, (iv) there were no adverse impacts on the water supply and surrounding area from EQT's fracking operations, and (v) that any adverse impacts would be adequately addressed by EQT, among other misrepresentations and concealment.

195.    Plaintiffs detrimentally relied upon Defendants' misrepresentations and concealment, and were damaged by Defendants' bad faith conduct.

196.    By and through such fraud, concealment, deceit, misrepresentations, and/or omissions, Defendants intended to induce Plaintiffs to alter their position to their detriment.

197.    As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiffs have suffered damages and continue to suffer damages in an amount to be determined at trial.

198.    Defendants' conduct constitutes willful and wanton conduct and actual malice, and shows a conscious disregard of the rights and safety of other persons, warranting punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of all other members of the proposed Classes, seek the following relief:

a.  An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Classes as requested herein, appointing Plaintiffs and the undersigned counsel to represent the Classes, and that notice to the Classes to be paid by Defendants;

b.  A declaration that Defendants have committed the violations alleged herein;

c.  Damages according to proof in an amount to be determined at trial;

d.  Punitive damages according to proof in an amount to be determined at trial;

e.  Attorney's fees, costs, and expenses, as permitted by law;

f.  Pre-and post-judgment interest as permitted by law;

g.  Equitable, injunctive, and declaratory relief, including without limitation, future medical monitoring of Plaintiffs and Class Members;

h.  All other equitable relief; and

i.  Any other relief that that the Court deems just and proper.

Date: June 20, 2024                          Respectfully submitted,


                                             */s/ Kimberly Russell*
                                             Kimberly Russell (*pro hac vice forthcoming*)
                                             **THE RUSSELL LAW FIRM, PLLC**
                                             1140 3rd Steet NE
                                             Washington, D.C. 20002
                                             Phone: 202-430-5085
                                             Email: kimberly@russellatlaw.com


                                             */s/ Joy D. Llaguno*
                                             Joy D. Llaguno (Pa. No. 327120)
                                             **HOOK & HOOK PLLC**
                                             430 East Oakview Drive, Suite 101
                                             Waynesburg, PA 15370
                                             Phone: 724-824-3302
                                             Fax:    724-638-2186
                                             Email: jllaguno@hooklaw.com


                                             *Attorneys for Plaintiffs and the Putative Class*

## JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves and the Classes, hereby demand a trial by jury in this action of all issues so triable.

Date: June 20, 2024                    Respectfully submitted,

/s/ Kimberly Russell
Kimberly Russell (*pro hac vice forthcoming*)
THE RUSSELL LAW FIRM, PLLC
1140 3rd Steet NE
Washington, D.C. 20002
Phone: 202-430-5085
Email: kimberly@russellatlaw.com

/s/ Joy D. Llaguno
Joy D. Llaguno (Pa. No. 327120)
HOOK & HOOK PLLC
430 East Oakview Drive, Suite 101
Waynesburg, PA 15370
Phone: 724-824-3302
Fax:     724-638-2186
Email: jllaguno@hooklaw.com

*Attorneys for Plaintiffs and the Putative Class*