**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DAVID HICE, JOSEPH MOORE and CHRISTINA BARLOW, individually and on behalf of all others similarly situated, | ) ) ) ) | Case No. 2:24-cv-896-WSH |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| EQT CORPORATION, EQT PRODUCTION COMPANY and BEUSA HOLDINGS, INC., | ) ) ) | |
| Defendants. | ) | |

**<u>EQT CORPORATION AND EQT PRODUCTION COMPANY'S BRIEF IN
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

Defendants EQT Corporation and EQT Production Company file this *Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction*.

## TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................. 4

    A.  Oil and gas development in the Marcellus Shale and Plaintiffs' claims ...................... 4

    B.  Regulation of Marcellus Shale Development in Pennsylvania .................................... 6

    C.  The Fox Hill Event ................................................................................................... 8

    D.  PADEP's Response to the Fox Hill Event ................................................................. 9

    E.  EQT's Response to the Fox Hill Event ....................................................................11

        1.    EQT ............................................................................................ 12

        2.    Moody and Associates, Inc. ...................................................... 13

        3.    Echelon Applied Geosciences Consulting ................................. 14

        4.    Gilmore & Associates, Inc. ....................................................... 14

    F.  EQT's Supply of Water Buffalos ............................................................................ 16

    G.  Plaintiffs' Motion for Injunctive Relief .................................................................. 17

    H.  The Saba Report ..................................................................................................... 19

III.  ARGUMENT ....................................................................................... 21

    A.  Plaintiffs are not entitled to mandatory preliminary injunctive relief against EQT.... 21

        1.    Legal Standard. ........................................................................ 21

        2.    Plaintiffs' Motion should be denied as Plaintiffs cannot seek mandatory injunctive relief that is absent from their Complaint. .............................. 22

        3.    Plaintiffs have not satisfied (and cannot satisfy) their heightened burden for mandatory preliminary injunctive relief against EQT. ....................... 24

    B.  Plaintiffs are not likely to prevail on the merits of their underlying claims. ............. 24

        1.    Plaintiffs have not adduced credible evidence of causation, as required by each of the claims upon which they predicate their Motion. ................... 25

        2.    In addition to their lack of causation proof, Plaintiffs' claims are unlikely to prevail on the merits because they cannot establish the elements of their underlying claims ................................................................................. 29

        3.    Plaintiffs' claims are unlikely to prevail on the merits because their claims are barred by administrative finality doctrines. ........................................ 31

    C.  Plaintiffs cannot demonstrate immediate and irreparable harm. ............................... 34

        1.    Plaintiffs cannot demonstrate immediate and irreparable harm on behalf of themselves, their affiants or their putative class. ...................................... 34

2.    Plaintiffs cannot demonstrate immediate and irreparable harm where any assertion of "immediacy" is undercut by their own delay in bringing the Motion. ................................................................................................. 37

3.    Plaintiffs cannot demonstrate immediate and irreparable harm where they and "affected residents" can be compensated through money damages... 38

D.  While the Court need not analyze the remaining injunctive elements, they nevertheless do not bend in Plaintiffs' favor. ............................................. 39

IV.    CONCLUSION ............................................................................................ 42

## EXHIBIT LIST[1]

**Exhibit 1:**   Affidavit of Jessie L. Bobrzynski, P.G., LRS

**Exhibit 2:**   Affidavit of Fred J. Baldassare, P.G.

**Exhibit 3:**   Affidavit of Thomas D. Gillespie, P.G.[2]

**Exhibit 4:**   Affidavit of Dr. Tarek Saba

**Exhibit 5:**   Affidavit of J.E.B. Bolen

**Exhibit 6:**   Affidavit of Michael Lauderbaugh

**Exhibit 7:**   Fed. R. Civ. P. Rule 1006 Summary Chart of Pa. Department of Environmental Protection Water Supply Complaint Determinations (with compilation of PADEP determination letters attached)

**Exhibit 8:**   July 24-25, 2024 and August 23, 2024 E-Mails Among Counsel

**Exhibit 9:**   Pa. Environmental Hearing Board Docket Search Screenshots for "Hice" and "Moore"

---

[1] The Bobrzynski, Baldassare and Gillespie Affidavits (Exhibits 1-3) have each been filed in two parts due to their size exceeding the upload limitations for the Court's CM/ECF filing system.

[2] Attachment 3 to Exhibit B to Mr. Gillespie's Affidavit has been withheld due to the volume of the Attachment and for confidentiality reasons. Attachment 3 can be made available to counsel pursuant to an appropriate protective order and/or the Court upon request.

## I.     INTRODUCTION

After a delay of over two years from the alleged event that is the focus of Plaintiffs' Motion for Preliminary Injunction ("Plaintiffs' Motion" or "Motion"), and then a lag of several additional weeks while Plaintiffs attempted to develop an injunction theory to present to the Court, Plaintiffs now seek mandatory injunctive relief against EQT Corporation and EQT Production Company (collectively, "EQT"). Plaintiffs' Motion is meritless, contains numerous inadequacies and should be denied.

Plaintiffs assert that EQT's underground drilling and hydraulic fracturing operations thousands of feet below the ground in Greene County, Pennsylvania somehow resulted in widespread impacts to shallow water wells throughout two surrounding townships—a complex liability theory that would require proof through scientific and technical evidence. Yet, Plaintiffs offered no expert evidence in support of their claims. Instead, Plaintiffs rely on two lay affidavits and a medley of anecdotal, indirect information, none of which allows Plaintiffs to meet the heavy burden to demonstrate that they are likely to prevail on the merits or that there is immediate and irreparable (or any) harm.

In contrast, EQT presents four scientific experts that evaluated the claims at issue. First, Moody and Associates, Inc., obtained, tested, and evaluated 145 water quality samples from 77 water sources in the relevant area, concluding that EQT's operations did not impact surrounding water supplies. *See* Affidavit of Jessie L. Bobrzynski, P.G., LRS ("Bobrzynski Aff."), attached hereto as **Exhibit 1** (Expert Reports attached to Bobrzynski Aff. as Exhibits B and C). Second, Echelon Applied Geosciences Consulting evaluated and interpreted gas geochemistry and chemical isotopes from gas samples captured at water and gas wells near EQT's operations and concluded that none of the samples scientifically matched the type of gas involved in EQT's

operations.  *See* Affidavit of Fred J. Baldassare, P.G.("Baldassare Aff."), attached hereto as **Exhibit 2** (Expert Report attached to Baldassare Aff. as Exhibit B).  Third, Gilmore & Associates, Inc. performed a causation analysis and ruled out EQT's operations as having an impact on the abandoned gas well that is the focus of Plaintiffs' claims.  *See* Affidavit of Thomas D. Gillespie, P.G. ("Gillespie Aff."), attached hereto as **Exhibit 3** (Expert Report attached to Gillespie Aff. as Exhibit B).  Fourth, Exponent, Inc. evaluated the potential for oil and gas operations to cause fluid or gas to travel upward from thousands of feet underground, through multiple geological layers, to shallow residential water supplies and concluded that such impact was not only contrary to the existing body of scientific evidence, but also would require specific water well assessments for each individual's claim (like those performed by EQT's experts but not by Plaintiffs).  *See* Affidavit of Dr. Tarek Saba, Ph.D ("Saba Aff."), attached hereto as **Exhibit 4** (Expert Report attached to Saba Aff. as Exhibit B).

In addition, the Pennsylvania Department of Environmental Protection ("PADEP") was asked by certain local residents to evaluate whether EQT's operations impacted their water supplies.  PADEP studied available water well data, and for every assessment it completed (13 in total), PADEP independently determined that there was no evidence of any impact to water supplies from EQT's operations.  *See* Fed. R. Civ. P. 1006 Summary Chart of PADEP Water Supply Complaint Determinations (with compilation of PADEP determination letters attached), attached hereto as **Exhibit 7**.  PADEP also explained in its findings that constituents found in these water supplies appeared to be naturally occurring, findings that are consistent with EQT's experts.

The two affidavits presented by Plaintiffs are not only noteworthy for their lack of scientific or technical assessment, but also because EQT is voluntarily providing those affiants with temporary alternative water, the same general relief Plaintiffs seek as a remedy.  *See* ECF No. 23-

15 (Affidavit of David Hice) and ECF No. 23-16 (Affidavit of William Yoders).   In addition, EQT held a public meeting in 2023 and then offered temporary alternative water to other residents while investigations were ongoing.  Each of the residents who requested alternative water are receiving that water, again the same general relief sought in the Motion.

In light of this background, and as explained more fully herein, Plaintiffs' Motion seeking mandatory injunctive relief fails for multiple reasons:

- Plaintiffs' Motion seeks relief that was not requested in their Complaint, so the Motion should be denied.

- Plaintiffs are unable to meet the heavy burden of proof required to establish that they are likely to prevail on their underlying claims:

  o Plaintiffs have not presented credible or admissible causation evidence, which the law requires for Plaintiffs to obtain the relief sought here.  In fact, Plaintiffs present no specific, science-based evidence to support their claims, unlike the substantial, un-rebutted, science-based evidence presented by EQT.

  o Plaintiffs' claims on which their Motion is based are legally deficient in that they do not allow for the type of relief requested or are untimely.

  o Plaintiffs' claims on behalf of certain putative class members, including named plaintiffs Mr. Hice and Mr. Moore, are barred because the PADEP determined that their water supplies were not negatively impacted by oil and gas activities.  These landowners are precluded from collaterally challenging the PADEP's negative determinations regarding their water supplies by filing a separate judicial proceeding in this Court.

- Plaintiffs are equally unable to make the clear showing required to establish that they or their putative class are suffering immediate and irreparable harm:

  o The affiants in support of the Motion are receiving alternative water from EQT, so they are suffering no immediate or irreparable harm, even if they had established causation (which they did not).

  o Plaintiffs have offered no credible evidence, as required by Third Circuit precedent in *Adams v. Freedom Forge Corp.*, 204 F.3d 475 (3d Cir. 2000), to demonstrate that putative class members are suffering any harm.

     ○   The individuals in the community who were interested in receiving alternative water are receiving that water from EQT, and EQT agreed to provide that water during its investigation of the alleged water supply impacts.

- The lack of immediate and irreparable harm is highlighted by the lengthy delay in seeking the relief requested in the Motion. By waiting more than two years since the alleged harm occurred, and more than two months since the filing of this suit, Plaintiffs' own actions reveal that there is no need for urgent action.

- Plaintiffs' requested relief, which can be addressed by monetary damages (and Plaintiffs seek these exact damages in their Complaint), is overly general and vague and would burden this Court with the obligation to oversee an imprecise and undefined process.

As a result, EQT respectfully suggests that the Court deny Plaintiffs' Motion.

## II.    FACTUAL BACKGROUND

### A.    Oil and gas development in the Marcellus Shale and Plaintiffs' claims

Located in the Appalachian Basin, the Marcellus Shale is a gas-bearing formation that lies approximately 7,000 feet below the ground surface in Greene County Pennsylvania. Ex. 4, Saba Aff. at Ex. B, p. 7; *see also* Marcellus Shale: NPDES Program Frequently Asked Questions, U.S. Environmental Protection Agency 1 (Mar. 16, 2011), available at https://www3.epa.gov/npdes/pubs/hydrofracturing_faq.pdf (last accessed Sept. 20, 2024) ("EPA NPDES FAQs") (the Marcellus Shale lies between 5,000 and 9,000 feet below the ground surface across parts of Ohio, New York, Maryland, Pennsylvania, and West Virginia). It has been known for years that gas was trapped in the Marcellus Shale, but, in the past, operators lacked the technology to cost-effectively free the gas and bring it to the surface. EPA NPDES FAQs, at 1; *see also* Drilling for Natural Gas in the Marcellus Shale Formation: Frequently Asked Questions, Pa. Dep't of Envt'l Prot., available at https://files.dep.state.pa.us/oilgas/bogm/bogmportalfiles/marcellusshale/marcellusfaq.pdf (last accessed Sept. 20, 2024) ("PADEP FAQs"). That changed in the early 2000s with advances in directional drilling. EPA NPDES FAQs, at 1.

Directional drilling is a technique used to increase production from Marcellus Shale. Early oil and gas wells were drilled vertically into the reservoir and might be exposed to as little as 50 feet of the targeted formation and accompanying gas. Hydraulic Fracturing Overview 1, Pa. Dep't of Envt'l Prot., available at https://files.dep.state.pa.us/OilGas/BOGM/BOGMPortalFiles/MarcellusShale/DEP%20Fracing%20overview.pdf (last accessed Sept. 20, 2024) ("PADEP HF Overview"). As drilling technology improved, however, operators could deviate wells in a horizontal direction as they were drilled underground. Operators thus became able to expose the wells to far more of the targeted formation (for example, the Marcellus Shale). *Id.*; Hydraulic Fracturing for Oil and Gas: Impacts from the Hydraulic Fracturing Water Cycle on Drinking Water Resources in the United States, U.S. Envt'l Prot. Agency, at 3-4 (Dec. 2016), *available at* https://cfpub.epa.gov/ncea/hfstudy/recordisplay.cfm?deid=332990 (last accessed Sept. 20, 2024) ("EPA Study"). A well that is deviated horizontally, for instance, can have horizontal segments (also called "laterals") extending thousands of feet through the targeted formation. PADEP HF Overview, at 1.

By combining directional drilling with hydraulic fracturing, operators are able to produce from low-permeability formations (formations that have a very limited ability to allow gas or water to flow through them) that were previously inaccessible or uneconomic. EPA NPDES FAQs, at 1. Wells drilled into these formations are generally called "unconventional wells" to distinguish them from "conventional wells" that generally did not utilize directional drilling to develop. EPA Study, at 3-7.

Plaintiffs contend that EQT's operations at a well site known as Lumber 13H, a well EQT drilled in the Marcellus Shale, resulted in gas and hydraulic fracturing fluid somehow migrating from the lateral in the Marcellus Shale several thousand feet upward and through numerous geologic and bedrock layers into the groundwater supplying their water wells. *See, e.g.,* ECF No. 1 ("Compl."), ¶¶ 1, 31, 33 & 44-45. To prove this theory, however, Plaintiffs must overcome two basic geologic facts (which they do not attempt to do). *First*, the Marcellus Shale in this area is

separated from groundwater resources by more than 7,000 feet and 38 geologic layers, many of which are characterized by their low permeability (i.e., low potential for vertical migration of fluids). Ex. 4, Saba Aff. at Ex. B, p. 5. And, *second*, hydraulic



*Figure 1:* Geologic Layers in Greene County, PA, Ex. 4, Saba Aff. at Ex. B, p. 6.

fracturing fluids cannot migrate vertically from the Marcellus Shale through underground geologic layers without sustained pathways and long-term pressure over a period of several years. *Id.* at pp. 7-8. Plaintiffs' theory is contrary to the current body of scientific evidence on this issue. *Id.* at p. 10.

**B.    Regulation of Marcellus Shale Development in Pennsylvania**

Pennsylvania has a detailed statutory and regulatory scheme designed to prevent potential water supply impacts from oil and gas operations. In 2012, the Pennsylvania General Assembly adopted Act 13 of 2012 to update the Commonwealth's Oil and Gas Act in response to increased development of unconventional formations like the Marcellus Shale. *See* 58 Pa. C.S. §§ 3201-

3274. Subsequently, in 2016, the Pennsylvania Environmental Quality Board adopted regulations to implement Act 13. *See* 25 Pa. Code §§ 78.1-78.906 (Conventional Wells) and 25 Pa. Code §§ 78a.1-78a.314 (Unconventional Wells). Both the statute and the regulations include provisions for the construction, operation, and assessment of wells for the protection of water supplies.

One such provision is the requirement that an operator run a series of casings (steel pipes) and cement through the fresh water-bearing geological layers near the surface "[t]o prevent migration of gas or fluids into sources of fresh groundwater and pollution or diminution of fresh groundwater." 58 Pa. C.S. § 3217(b).



*Figure 2*: Examples of Casing. EPA Study at 3-15.

PADEP has implemented this statutory requirement by adopting regulations mandating operators meet certain casing and cementing standards, including the use of multiple casing strings. 25 Pa. Code § 78a.83(a); *see also* 25 Pa. Code §§ 78a.81-78a.87. The purpose of these requirements is to create multiple impermeable barriers between groundwater and the fluid and gas that flows through a well.

The Oil and Gas Act also gives landowners rights aimed at protecting their water supplies. A landowner who suspects that his or her water supply was reduced or polluted as a result of oil and gas operations can require PADEP to conduct an investigation. 58 Pa. C.S. § 3218(a).[3] If PADEP's investigation concludes that the operator caused the complained-of diminution or pollution, the operator must either restore or permanently replace the affected water supply. 58

---

[3] PADEP maintains an Office of Oil and Gas Management that is responsible for "statewide oil and gas conservation and environmental programs to facilitate the safe exploration, development, [and] recovery of Pennsylvania's oil and gas reservoirs in a manner that will protect the commonwealth's natural resources and the environment" and "develops policy and programs for the regulation of oil and gas development and production" while also overseeing oil and gas permitting and inspection within the Commonwealth. *See* Oil and Gas Programs, Pa. Dep't of Evtl. Prot., https://www.dep.pa.gov/Business/Energy/OilandGasPrograms/Pages/default.aspx (last accessed Sept. 18, 2024).

Pa. C.S. § 3218(a). Both negative and positive determinations of pollution or diminution by PADEP are appealable to the Pennsylvania Environmental Hearing Board ("EHB"), *see Kiskadden v. Com.*, EHB Docket No. 2011-149-R, 2012 WL 1981287, at *9 (Pa. Env. Hrg. Bd. May 16, 2012), an administrative court that specializes in evaluating highly technical and scientific environmental matters, *see Wheeling Pittsburgh Steel Corp. v. Com.*, EHB Docket Nos. 2005-09-3R, 2005-094-R, 2006-060-R, 2008 WL 2620918, at *8 (Pa. Env. Hrg. Bd. June 20, 2008).[4]

### C.    The Fox Hill Event

EQT is an independent oil and gas company headquartered in Pittsburgh, Pennsylvania, and a leading developer in the Marcellus Shale. Affidavit of J.E.B. Bolen ("Bolen Aff."), attached hereto as **Exhibit 5**, ¶ 3. Among its well sites in the Marcellus Shale is the Lumber well site in Springhill Township, Greene County, Pennsylvania (the "Lumber Site"). *Id.* at ¶ 4. At the Lumber Site, EQT horizontally drilled and hydraulically fractured multiple wells designated as 1H, 3H, 5H, 7H, 9H, 11H, 13H, and 15H. *Id.* at ¶ 5.

At 4:25 p.m. on June 19, 2022, EQT was preparing to start the 100th stage of its hydraulic fracturing operation for Lumber 13H when it was notified that an abandoned oil and gas well three-quarters of a mile to the northwest ("Fox Hill 1") was expressing gas and water (the "Fox Hill Event"). Affidavit of Michael Lauderbaugh ("Lauderbaugh Aff."), attached hereto as **Exhibit 6,** July 13, 2022 Letter from M. Lauderbaugh to J. Keller attached to Lauderbaugh Aff. as Exhibit B at Table 1. EQT immediately sent a representative to Fox Hill 1 to investigate. *Id.* EQT noticed that the timing of its operations at Lumber 13H initially appeared to coincide with Fox Hill 1

---

[4] The Pennsylvania EHB is a special tribunal established by the Environmental Hearing Board Act, 35 P.S. §§ 7511-7516 and its purpose is to hear appeals from actions and final decisions taken by the PADEP. *See* EHB website at https://ehb.pa.gov. The EHB has specialized expertise in Pennsylvania environmental law, statutes and regulations and regularly holds evidentiary hearings and makes adjudications, opinions, orders and decisions (including on water supply complaints). *Id.* Appeals from decisions of the EHB are taken to the Commonwealth Court of Pennsylvania. *Id.*

expressing gas and water, so EQT suspended operations for Lumber 13H.  *Id.*  EQT reported the event to PADEP and commenced an investigation into its cause.  *Id.* at pp. 1-3.

### D.    PADEP's Response to the Fox Hill Event

On June 23, 2022, following a visit to the Lumber Site, PADEP issued an inspection report containing notices of alleged regulatory violations and requiring EQT to provide information and perform tests on Lumber 13H.  Ex. 6, Lauderbaugh Aff. at Ex. A (PADEP Inspection Record No. 3384307).  In the inspection report, PADEP prematurely referred to the Fox Hill Event as a confirmed "communication" between Lumber 13H and Fox Hill 1, notwithstanding that no technical investigation had yet been performed.[5]  *See, generally, id.*  PADEP's inspection report is not a final action by PADEP and thus could not be challenged and was not appealable by EQT under Pennsylvania law.  *See, e.g., id.* at p. 7; *Glahn v. Dep't of Envt'l Prot.*, 298 A.3d 455 (Pa. Commw. 2023) (non-final actions of PADEP are not appealable).  EQT, accordingly, responded in writing on July 13, 2022, disputing PADEP's findings in the inspection report.[6]  *See* Ex. 6, Lauderbaugh Aff. at Ex B.

PADEP, through final and appealable actions, subsequently prohibited EQT from resuming its operations at the Lumber Site, or EQT's nearby Spleen Splitter well site ("Splitter Site"), unless EQT took a number of additional actions related to these well sites.  *See* Ex. 5, Bolen Aff. at Ex. C (August 10, 2023 Letter from John Ryder to J.E.B. Bolen); *see also* Ex. 5, Bolen Aff. at Ex. B (Unconventional Alteration Permit, Spleen Splitter 6H).  EQT filed an appeal to the EHB and ultimately reached a settlement with PADEP that allowed EQT to continue operations at the Lumber Site and begin operations at the Splitter Site so long as EQT conducted additional expert

---

[5] The June 23, 2022 inspection report refers to Fox Hill 1 as the "offset well" as its identity was then unknown.

[6] The July 13, 2022 NOV response refers to Fox Hill 1 as the "Reed #1 Well," in a mistaken belief as to its identity.

investigations into the events at Fox Hill and employed a detailed, real-time, monitoring program with weekly reports submitted to PADEP. *See EQT Prod. Co. v. Pa. Dep't of Envt'l Prot.*, EHB Docket Nos. 2023-071-B & 2023-072-B (Pa. Env. Hrg. Bd. filed Sept. 11, 2023).

In the meantime, PADEP also commenced investigations into complaints by local residents that alleged contamination of their water supplies. *See* Ex. 7 (compilation of PADEP determination letters). PADEP completed the investigation of all but one complaint between March and August 2023 and found that it could not substantiate any connection between the alleged water well impacts and EQT's hydraulic fracturing activities at the Lumber Site.[7] *See id.* Typical of the negative determination letters that PADEP sent the complainants were the following:

- "The [EQT] Lumber Well Site is over 6,500 feet from your Water Supply. Activity occurring at this Well Site at that distance is unlikely to cause an impact to your Water Supply." *Id.* (Investigation No. 366764).

- "The Department investigated nearby oil and gas activities to determine possible pathways of contamination to the Water Supply. No such pathways have been identified." *Id.* (Investigation No. 368810).

- "The presence of dissolved gas appears to be a natural occurrence in water supply wells in this area." *Id.* (Investigation No. 366375).

- "[Barium, calcium, magnesium, sodium and strontium] are naturally occurring minerals in the earth's crust and abundant in soil. Springs are highly influenced by surface water and commonly exhibit elevated turbidity (sediment), especially after precipitation events. . . . Although there was an increase in these parameters over pre-drill values, they are shown to be pre-existing within the pre-drill samples." *Id.* (Investigation No. 365276).

- "Manganese is a naturally occurring element commonly in exceedance within the bedrock formation that your Water Supply appears to be completed within. The sodium level exceeds the recommended level. Sodium is also a naturally occurring element found in limestone bedrock, which occurs in the formations that your Water Supply appears to be completed within." *Id.* (Investigation No. 367330).

---

[7] Two complainants withdrew their complaints, and one complainant failed to respond to PADEP's outreach.

Notably, Plaintiffs David Hice and Joseph Moore were among those who submitted complaints to PADEP alleging that EQT's operations had impacted their water supplies. *See* Ex. 7, pp. 172, 216. But, as with the other complaints it reviewed and reached a determination, PADEP found that neither Mr. Hice's nor Mr. Moore's complaint was substantiated, informing them in respective letters on June 13, 2023, that "the Department cannot conclude that the Water Supply was adversely affected by oil and gas activities." *Id.*[8]

In short, PADEP has determined that there was no evidence of pollution or diminution from EQT's operations in every water supply complaint it has resolved. *See* Ex. 7. And where constituents were found in the complainant's water supply, PADEP noted that they were common to groundwater in this area of Greene County. *Id.*; *see also* EPA Study at 6-23 (noting that "[d]etectable levels of dissolved natural gas exist in some aquifers, even in the absence of human activity"). Critically, not one of the complainants (including Plaintiffs' Mr. Hice or Mr. Moore) exercised their right to appeal the PADEP's negative determination to the EHB, where they could have challenged PADEP's conclusion before an administrative Judge with vast experience in oil and gas law and science.

### E.    EQT's Response to the Fox Hill Event

In addition to the investigations conducted by PADEP, EQT retained several experts and spent almost two years investigating the Fox Hill Event and nearby water supplies, resulting in several detailed scientific reports finding that EQT's operations did not communicate with Fox Hill 1 nor did EQT's operations impact nearby water supplies.

---

[8] When Mr. Hice states in his affidavit that he "ha[s] not received an update from the PADEP on the conclusion of their investigation," Hice Aff. ¶ 8, ECF No. 23-15, he is mistaken. PADEP concluded its investigation with a negative determination more than a year ago. *See* Ex. 7, p. 216.

1.    **EQT**

After the June 19, 2022 event, EQT promptly reviewed the casing tests that had been performed when the Lumber Site was first developed and found no anomalies.  Ex. 6, Lauderbaugh Aff. at Ex. B, p. 3 & Attachment C.  And, on June 22, 2022 and June 23, 2022, EQT conducted post-Incident pressure testing and caliper logging for the Lumber 13H casing, again finding no anomalies.  *Id.* at p. 3.  EQT accordingly confirmed that the steel casing strings retained their mechanical integrity "[t]o prevent migration of gas or fluids into sources of fresh groundwater and pollution or diminution of fresh groundwater," as required by Pennsylvania law.  *See* 58 Pa. C.S. § 3217(b).

EQT also voluntarily took over ownership of Fox Hill 1 (which was an abandoned well with no known operator) on August 11, 2022 and commenced operations to plug (i.e. permanently seal) the well by mid-December of that year.  Ex. 6, Lauderbaugh Aff. at Ex. C (December 13, 2022 Letter from M. Lauderbaugh to J. Keller).  EQT also committed to monitoring the hydraulic fracturing of the Lumber and Splitter Sites using a microseismic array covering approximately 22 square miles.  Ex. 3, Gillespie Aff. at Ex. B, p. 8.  To do its microseismic analysis, EQT used hundreds of ground-based sensors designed to detect small-scale underground seismic vibrations and convert this data into information that shows the underground length and direction of underground factures created in the Marcellus Shale during hydraulic fracturing.  *Id.*  EQT and those that would study the data accordingly would be able to confirm the absence of any communication event because it would have real-time microseismic data showing the distance and direction of the underground fractures that were propagated during the resumed stimulation process.  *Id.*  And, in fact, out of the 865 stimulation stages monitored when hydraulic fracturing

resumed at the Lumber and Splitter Sites, "no micro-seismic event was recorded outside the stipulated micro-seismic monitoring zone." *Id.* at p. 10.

### 2.    Moody and Associates, Inc.

EQT also hired a groundwater and environmental consulting firm—Moody and Associates, Inc. ("Moody")—to sample and evaluate water supplies surrounding Fox Hill 1 and Lumber 13H. Ex. 1, Bobrzynski Aff. at Ex. B.  Moody's investigation was detailed and thorough: Moody initially obtained, tested, and evaluated 145 water quality samples from 77 sources over a 22-month period and prepared a report of its findings.  Ex. 1, Bobrzynski Aff. at Ex. C, pp. 2-3.

To start, on June 20, 2022, the day following the Fox Hill Event, Moody visited the property where Fox Hill 1 is located (the "Debolt Property") to sample that well and the property's two water wells; Moody would return 10 more times to collect additional samples before its investigation concluded.  Ex. 1, Bobrzynski Aff. at Ex. C, Appendix A: Debolt W1 & Debolt W2. Moody also worked to sample nearby properties, although many landowners did not even want their water supplies sampled and tested.   On July 5, 2022, Moody sent letters requesting the ability to do water samples to 51 nearby landowners covering 86 properties.  Ex. 1, Bobrzynski Aff. at Ex. B, p. 3.  A few weeks later, on July 28, 2022, Moody sent a second set of letters to the 41 landowners representing 56 properties that had yet to respond.  *Id.* at pp. 3-4.  And on September 14, 2022, Moody conducted door-knocking and visual surveys in an effort to contact the landowners who had not responded to earlier contacts.  *Id.* at p. 4.  All told, Moody obtained permission to sample 57 of the 141 properties it had identified, ultimately obtaining 84 samples from 77 separate water sources.  *Id.*  Included in those samples were three samples each (six total) taken from affiant William Yoders' water wells on June 22, 2022, June 30, 2022, and April 6, 2023. Ex. 1, Bobrzynski Aff. at Ex. C, Appendix A: Yoders W1 & W2.  The remaining 84 properties

either did not have any sources for sampling or did not respond to Moody's outreach.  Ex. 1, Bobrzynski Aff. at Ex. B, p. 4.

On September 6, 2024, Moody issued an updated report to reflect the results of 59 additional water quality samples collected and analyzed from 19 separate water sources.  Ex. 1, Bobrzynski Aff. at Ex. C, p. 2.  Moody found it critical that the comprehensive water supply testing found no evidence in the water quality samples of chloride and bromide concentrations, which are associated with deep brines, produced fluid, or hydraulic fracturing fluid.  *Id.*  Moody also noted that EQT had placed transducers in nearby water wells to monitor water levels and observed no changes in water levels in response to EQT's resumed operations at the Lumber and Splitter Well Sites.  *Id.* at pp. 11-12.  Based on its analysis, Moody concluded for all water supplies that it sampled, which included the Yoders wells, "that there has been no impact to water supplies from the hydraulic stimulation of [] Lumber 13H or any other wells on the Lumber [Well Site] or from the June 19, 2022 event at the Fox Hill 1 conventional well."  *Id.* at p. 1.

### 3.    Echelon Applied Geosciences Consulting

EQT retained Echelon Applied Geosciences Consulting ("Echelon") to evaluate and interpret the gas geochemistry for 49 samples collected from Fox Hill 1 and surrounding soils and water and gas wells between June 20, 2022 and April 18, 2024.   Ex. 2, Baldassare Aff. at Ex. B, p. 1.  Analyzing those gas samples, Echelon concluded that none had characteristics matching gases from the Marcellus Shale formation in which EQT's operations took place.  *Id.* at pp. 11-12.

### 4.    Gilmore & Associates, Inc.

EQT retained Gilmore & Associates, Inc. ("Gilmore") to investigate and report on the cause of the events observed at Fox Hill 1 on June 19, 2022.  *See* Ex. 3, Gillespie Aff. at Ex. B.  Gilmore found that the Fox Hill Event was not an isolated occurrence; gas and water expelled from the Fox

Hill 1 well both before and after EQT's operations on June 19, 2022. *Id.* at p. 13. Specifically, erosion around the Fox Hill 1 wellhead that existed as of June 19, 2022, and thus occurred before that date, showed that "[t]he soil had been flushed out from below in increments over time with the crater growing by the episodic, gas-induced ejection of standing water from the former [Fox Hill 1] well casing." *Id.* Gilmore moreover found that Fox Hill 1 had exhibited surface expressions of gas and/or liquid on December 22, 2022 and January 18, 2023—six months and seven months, respectively, after EQT had suspended all hydraulic fracturing operations at the Lumber Site. *Id.* at p. 5.

Drawing on the evidence of these surface expressions and information about the pre-existing condition of Fox Hill 1, Gilmore concluded that the Fox Hill Event (as well as the subsequent two expressions in December 2022 and January 2023) was caused by a combination of factors unrelated to EQT's operations. Specifically, a column of standing water would accumulate at the bottom of the well's collapsed well bore. *Id.* at



*Figure 3:* Schematic of Fox Hill 1 Well Depicting Conditions of Former Gas Escapes and Current Rehabilitated Condition, Ex. 3, Gillespie Aff. at Ex. B, p. 39.

p. 7. But because the wellbore was open to the surrounding formations, the water column would never accumulate sufficient pressure to permanently cap the gas rising from below. *Id.* at p. 6-7. When enough gas accumulated below the water column to exceed the hydrostatic pressure of the accumulated water, it would express at the surface until the pressure equalized again. *Id.* at p. 7.

Gilmore ruled out communication from hydraulic fracturing operations as a potential cause. A communication event should have resulted in Marcellus Shale gas being found in gas samples taken from Fox Hill 1, but no Marcellus Shale gas was detected. *See* Ex. 3, Gillespie Aff. at Ex. B, p. 40. A communication event also should have resulted in the hydraulic fracturing of

wells at the Lumber and Splitter Sites causing significant changes in pressure in the cases and annuli at nearby monitoring wells, but no such changes were detected at any of the 17 conventional wells being monitored. *Id.* And a communication event should have resulted in micro-seismic monitoring showing that fractures propagated outside confining formations, opening pathways between the Marcellus Shale formation and the formations targeted by Fox Hill 1 and area water supplies. *Id.* Instead, the micro-seismic monitoring showed that "the collective hydro-fracturing envelopes for each well stimulated were within the predicted areal distribution," and the overlying Hamilton Formation "creat[ed] an effective vertical fracture propagation barrier." *Id.* at pp. 9, 40. There simply were no pathways (i.e., fractures or faults) along which gas or fluids from Lumber 13H (or any other well) could migrate to Fox Hill 1 or water supplies. *Id.* at p. 40. Gilmore accordingly concluded that "[t]here was no communication incident involving the transfer of either hydraulic or pneumatic pressure from Lumber 13 H to Fox Hill 1." *Id.* at p. 41.

F.    **EQT's Supply of Water Buffalos**

While investigations into the Fox Hill Event were ongoing, EQT supplied several area residents with water buffalos, providing an alternate source of water to their water wells. Following a town hall meeting held in August 2023, EQT provided water buffalos to local residents who requested them. Ex. 6, Lauderbaugh Aff. ¶ 3. A total of 29 residents requested and began receiving water buffalos as a result. *Id.* ¶ 4.

Since providing water buffalos, EQT and PADEP have completed investigations. PADEP found no evidence that any of the water supplies it investigated in response to statutory complaints were impacted by oil and gas development. *See* Ex. 7. And EQT's own investigation, supported by the reports of multiple experts, similarly concluded that EQT's operations did not impact Fox

Hill 1 or any nearby water supplies and that there were no anomalies in the hydraulic fracturing of Lumber 13H. *See, generally*, Section II(E)(1)-(4), *supra*.

With EQT's operations having been ruled out as a cause of the Fox Hill Event and any alleged water supply contamination, there is no longer justification for continuing to supply residents with temporary water supplies. Beginning in late 2023, after the data began to show that EQT's operations did not cause any harm to the water supplies, EQT accordingly started to notify residents receiving a water buffalo that EQT will be phasing out their delivery. In an effort to be a good neighbor in a community in which it operates, however, EQT gave residents two options: they could elect either for EQT to continue water buffalo deliveries for an additional year or for EQT to pay for the installation of a whole-home water treatment system. Ex. 6, Lauderbaugh Aff. ¶ 5. EQT took these actions despite knowing there was a chance that landowners might ultimately and unfortunately try to use the actions against EQT, like they are in this case.

### G. Plaintiffs' Motion for Injunctive Relief

On June 20, 2024, two years and a day after the Fox Hill Event, Plaintiffs initiated this action with the filing of their Complaint. *See* Compl. Just over a month later, on July 24, 2024, Plaintiffs' counsel contacted EQT's counsel threatening the present motion for injunctive relief and demanding that EQT provide "clean water" to residents and distribute information regarding water supplies. *See* E-mails Among Counsel ("M&C Emails"), attached hereto as **Exhibit 8**. EQT responded on July 25, 2024, that "solely in an effort to compromise and amicably resolve Plaintiffs' preliminary injunction threat, and without admitting any obligation to do so, EQT will continue to arrange for water for the existing water buffalos until further notice so long as doing so resolves the preliminary injunction motion." *Id.* at July 25, 2024 e-mail from M. Dausch to J. Llaguno. Plaintiffs' counsel never responded to this offer. Instead, Plaintiffs' counsel waited nearly a month,

until August 23, 2024, to again threaten the present injunction, which Plaintiffs proceeded to file on August 30, 2024 (37 days after first threatening to do so, 71 days after filing the action, and over one year after EQT first offered to provide water to area residents). *Id.* at Aug. 23, 2024 e-mail from J. Llaguno to counsel for Defendants.

In the present motion, Plaintiffs seek an Order directing EQT to take two forms of action: *first*, to submit and, upon Court approval, implement "a plan to provide affected residents reliable access to safe drinking water, including providing water buffalos and weekly water delivery comparable to the delivery currently being provided," and, *second*, to "deliver an information mailer to residents in Freeport Township and Springhill Township that provides informs [sic] them of the availability of water delivery, provides adequate information about potential water contamination, and contact information (phone number, e-mail address, and website) residents can use if they need additional water delivered."  ECF No. 22-1 at 19.

Plaintiffs ask for relief on behalf of every resident in Springhill and Freeport Townships, which covers an approximately 27 square mile area in southwestern Greene County (bordering West Virginia) and which differs from the proposed class area in this case. *See also*, Compl. ¶¶ 70-71, (providing proposed class definitions).



*Figure 4*: Greene County, Pennsylvania Map, Visit Greene, *available at* https://visitgreene.org/wp-content/uploads/2020/09/GCMap-2020.pdf (last accessed Sept. 20, 2024)

Plaintiffs seek this extraordinary mandatory injunctive relief without offering any expert testimony or evidence, and relying solely upon:

18

- Affidavits from two laypersons who *already* are receiving replacement water supplies and would not benefit from the remedy that plaintiffs seek in their motion. *See* ECF Nos. 23-15 at ¶ 8 & 23-16 at ¶ 14.

- News articles and generalized oil and gas studies that did not evaluate the area at issue, the timeframe at issue, the specific properties at issue, or the operations by EQT that are at issue. *See, e.g.,* Plfs. Br. at p. 3 nn.2 & 4, p. 5 n.5, p. 6 nn.7 & 8, p. 8, pp. 15-17, p. 16 nn. 9-10, & p. 17 n.11.

- Non-final inspection reports from PADEP that include an assumption, made before any scientific investigation was completed, that EQT's operations caused a communication incident, when PADEP's subsequent investigations have concluded that nearby water supplies were not, in fact, impacted by EQT's operations. *See* Section II(E), *supra.*

### H.    The Saba Report

In response to Plaintiffs' Motion, EQT has also retained Dr. Tarek Saba, an expert on water chemistry, hydrogeology, chemical forensics, and isotopic analysis of gases whose work studying hydraulic fracturing has been cited by the USEPA in multiple reports, including the 2016 study cited by Plaintiffs entitled *Hydraulic Fracturing for Oil and Gas: Impacts from the Hydraulic Fracturing Water Cycle on Drinking Water Resources in the United States.*

Dr. Saba prepared a report which concludes that the current body of scientific evidence demonstrates that there is an exceedingly low potential for hydraulic fracturing fluids to migrate vertically into groundwater resources. Ex. 4, Saba Aff. at Ex. B, pp. 4-10. One reason is basic geology. Groundwater resources supplying residential water wells in Pennsylvania are generally 50 to 400 feet deep, whereas the Marcellus Shale is generally over 7,000 feet deep. *Id.* at pp. 5, 12. In Greene County, moreover, the Marcellus Shale is separated from shallow groundwater by 38 geologic layers, many of which are characterized by their



***Figure 5***: Typical Residential Water Well, Ex. 5, Saba Aff. at Ex. B, p. 5.

low permeability (i.e., low potential for fluids to move through them). *Id.* at p. 5. Another reason is that fluids cannot migrate vertically from the Marcellus Shale without sufficient pressure to move them through those 38 separate geologic layers; this pressure would need to be sustained for years, yet the elevated pressure exerted on a gas well during the hydraulic fracturing process lasts only a few weeks and is intermittent. *Id.* at pp. 7-8.

Where, as here, Plaintiffs allege, based on two lay affidavits, that unidentified individuals throughout two townships have experienced widespread water supply contamination from oil and gas operations, Dr. Saba opines that individual property owner claims must be evaluated on an individualized basis. *Id.* at p. 11. The presence of gases and dissolved compounds can vary significantly from one well to another, with factors influencing variability including topography, surface water features, lithology, and surface activity and land use. *Id.* For example, topography influences groundwater depth (i.e., the lithologic formation in which the groundwater is found), which is significant because formation lithology and residence time can influence the extent to which certain compounds will naturally occur in the groundwater. Ex. 5, Saba Aff. at Ex. B, p. 13. Natural methane concentrations in groundwater also vary by topography. *Id.* at p. 17. Historical coal mining operations also can affect groundwater quality, with a study of coal mining's effects in Greene County concluding that it contributed to high concentrations of iron, manganese, and hardness, as well as the presence of hydrogen sulfide gas, methane gas, and occasional high concentrations of chlorides. *Id.* at pp. 14-15. Finally, site-specific uses, such as septic systems and fertilizer application, have the potential to reach the groundwater through infiltration and affect its quality. *Id.* at pp. 13-14. The influence of these factors on alleged water supply contamination

simply cannot be understood without individualized assessments, which Plaintiffs have not done. *Id.* at p. 11.

## III.    ARGUMENT

### A.    Plaintiffs are not entitled to mandatory preliminary injunctive relief against EQT.

#### 1.    Legal Standard.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). Such relief "should be granted only in limited circumstances." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004); *see also U.S. v. Spectro Foods Corp.*, 544 F.2d 1175, 1181 (3d Cir. 1976) ("The power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised.").

To establish its entitlement to such extraordinary relief, the movant bears the heavy burden of satisfying, through the presentation of "clear evidence," four separate elements: (1) a likelihood of success on the merits of its underlying claims; (2) irreparable harm in the absence of an injunction; (3) preliminary relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief. *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018); *see also Adams v. Freedom Forge Corp.*, 204 F.3d 475, 486 n.10 (3d Cir. 2000) ("[T]he burden is clearly on the moving party to prove all elements required for a preliminary injunction[.]") (citing *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994)).

The movant must satisfy the first two elements before a court evaluates the remaining ones. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) ("[A] movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors . . . If these gateway factors are met, a court then considers the remaining two[.]"); *see also Adams*, 204 F.3d at 484 ("A court may not grant [preliminary] injunctive relief without satisfying these [first two]

requirements, regardless of what the equities seem to require.").  Where, as here, the movant seeks mandatory preliminary injunctive relief that will alter the status quo, it "bears a particularly heavy burden," especially with respect to these two foundational elements.  *Acierno*, 40 F.3d at 653.  And in a putative class action, the movant must demonstrate specific and personal irreparable harm as to each named plaintiff and each putative class member.  *Adams*, 204 F.3d at 485-91 & n. 10 ("Merely petitioning for class certification cannot provide plaintiffs the right to be treated collectively.").

Plaintiffs are not entitled to the mandatory injunctive relief that they seek in the Motion— either in their own right or on behalf of their putative class.

**2.    Plaintiffs' Motion should be denied as Plaintiffs cannot seek mandatory injunctive relief that is absent from their Complaint.**

Plaintiffs make a two-part request:  First, they ask this Court to order EQT to devise a plan for Court consideration and approval to provide allegedly affected residents "reliable access to safe drinking water," including by providing water buffalos and weekly water delivery "comparable" to the delivery currently being provided.  ECF No. 23 ("Plfs. Br.") at 29.  Second, Plaintiffs ask the Court to direct an informational mailer to be delivered to residents in Freeport Township and Springhill Township (an area they admit is larger than their putative class area).  *Id.* at 12, 29.  This mailer would provide information regarding the availability of water delivery and provide "adequate information" about potential water contamination and contact information for residents to use if they need additional water delivered, including the creation of a website for this information.  *Id.* at 29.  Plaintiffs neither plead a right to this relief nor seek such relief in their Complaint.[9]

---

[9] Indeed, aside from assertions that EQT should be required to conduct environmental remediation and a request for this Court to establish and supervise a future medical monitoring program, Plaintiffs' Complaint does not seek any

As a threshold matter, Plaintiffs are precluded from requesting the injunctive relief sought in their Motion. Because a court's "equitable power lies only over the merits of the case or controversy before it," *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015), a preliminary injunction narrowly operates to afford a plaintiff "a measure of" the relief pled for in the suit at hand "in advance of proving that [it] is entitled to final relief." *Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 934 F.2d 30, 33 (2d Cir. 1991); *see also Nelson v. Niessner*, No. 3:23-cv-00192, 2023 WL 8781138, at *1 (W.D. Pa. Dec. 19, 2023) ("Rule 65 is not for the purpose of granting relief not sought . . . in the underlying action."); *Westbank Yellow Pages v. BRI, Inc.*, Civ. A. No. 96-1128, 1996 WL 255912, at *1 (E.D. La. May 13, 1996) ("A preliminary injunction is not an appropriate vehicle for trying to obtain relief that is not even sought in the underlying action."). Accordingly, a plaintiff cannot obtain preliminary injunctive relief that deviates from the relief requested in the complaint. *See, e.g.*, *Angle v. Little*, No. 2:22-cv-01772, 2023 WL 3742607, at *3 (W.D. Pa. May 2, 2023) (denying preliminary injunction where "request for injunctive relief [was] distinct from" any requests raised in underlying complaint), *report and recommendation adopted*, 2023 WL 3740708 (W.D. Pa. May 31, 2023); *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (denying preliminary injunction when plaintiff made new assertions different from the claim raised and relief requested).

But that is precisely what Plaintiffs seek here. Plaintiffs request widespread water distribution supported by an informational mailing program—a multiphase process that Plaintiffs do not seek in their Complaint and that they leave to EQT and the Court to define and implement.

---

injunctive relief on behalf of Plaintiffs or their putative class. *See* Compl. ¶¶ 3, 98, 131, 147, 162, 183 & Prayer for Relief.

Plfs. Br. at 29.[10]  Plaintiffs' attempt to have this Court conjure an already disfavored form of injunctive relief which is not sought in the underlying action should be rejected, and the Motion should be denied on this basis alone.

### 3. Plaintiffs have not satisfied (and cannot satisfy) their heightened burden for mandatory preliminary injunctive relief against EQT.

Plaintiffs are plainly unable to meet the "particularly heavy burden" required for the mandatory injunctive relief they seek. *Acierno*, 40 F.3d at 653.  That inability is apparent on various, independent fronts.

### B. Plaintiffs are not likely to prevail on the merits of their underlying claims.

Plaintiffs base their Motion upon three causes of action from their Complaint: (1) Pennsylvania's Hazardous Sites Cleanup Act ("HSCA"), 35 Pa. C.S. § 6020.101, et seq.; (2) negligence; and (3) nuisance.  Plfs. Br. at 13; *see also* Compl. at Counts I (HSCA), II (negligence) & IV (private nuisance).  To obtain the mandatory injunctive relief they seek from this Court, Plaintiffs must first demonstrate a "substantial likelihood" of success on the merits of these underlying claims and that their right to relief is "indisputably clear." *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) (internal quotation marks omitted).  To meet this heavy burden requires the presentation of "clear evidence." *Doe*, 897 F.3d at 518.  Because Plaintiffs have not made—and cannot make—that showing, their Motion must be denied.

---

[10] In addition to the multiple other failures in the relief sought by Plaintiffs, the Motion improperly seeks injunctive relief not just for the uncertified class members in this case, but also on behalf of unidentified, non-parties in Freeport and Springhill Townships residing *outside* the class area as defined by Plaintiffs. *See* Plfs. Br. at 12 (stating New Freeport Township and Springhill Township encompass a "larger area than the area as defined in the proposed Class definition"); *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." ); *see also City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276, 292 (3d Cir. 2019) ("[E]quitable relief should be 'dictated by the extent of the violation established.'") (quoting *Califano*, 442 U.S. at 702)).

### 1. Plaintiffs have not adduced credible evidence of causation, as required by each of the claims upon which they predicate their Motion.

Plaintiffs cannot demonstrate that they are likely to succeed on their claims because they cannot demonstrate that EQT's conduct caused the harm they allege.[11]  Plaintiffs claim that (1) EQT's operations on June 19, 2022 released hazardous chemicals into surrounding water supplies, somehow causing widespread water contamination; (2) this water contamination has subjected Plaintiffs and "affected residents" to health risks; and (3) Plaintiffs and these unidentified residents have, in fact, suffered (or will suffer) adverse health effects from that purported contamination. *See* Plfs. Br. at 13-21; *see also* Compl. at Counts I, II & IV.[12]  Plaintiffs, however, do not offer *any* legitimate scientific or medical evidence to substantiate their complex theory of liability, let alone the quantum of evidence they are required to offer to obtain a mandatory preliminary injunction. Instead, Plaintiffs rely solely on two lay witness affidavits (who are not qualified to draw conclusions about water contamination causation), news articles and generalized oil and gas studies, and non-final inspection reports from PADEP.  *See* Section II(G), *supra.*[13]  Plaintiffs'

---

[11] *See In re Joshua Hill, Inc.*, 294 F.3d 482, 485 (3d Cir. 2002) (entitlement to relief under HSCA requires showing defendant caused a release); *Schellenberger v. Kreider Farms*, 288 A.3d 898, 906 (Pa. Super. Ct. 2023) (to establish negligence, a plaintiff must prove a "causal connection between the conduct and the resulting injury"); *Youst v. Keck's Food Serv., Inc.*, 94 A.3d 1057, 1072 (Pa. Super. Ct. 2014) ("One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion" of another's private property).

[12] Plaintiffs' Motion specifically divides the nuisance claim into: (i) a statutory public nuisance claim under HSCA, which Plaintiffs' Complaint only cursorily references, *see* Compl. ¶ 95; and (ii) a common law private nuisance claim. *See* Plfs. Br. at 20-21.  Plaintiffs' Motion does not rely upon any of the other claims set forth in their Complaint for the "likely to prevail" element in their Motion.

[13] Plaintiffs repeatedly reference a December 2016 report from the U.S. Environmental Protection Agency (the "EPA Report") to support their allegations regarding health risks from hydraulic fracturing.  Plfs. Br. at 8, 16-17.  The EPA Report's findings pre-date Plaintiffs' allegations in this case by at least five (5) years, and the EPA Report did not evaluate EQT's oil and gas operations, the specific properties, or the class area at issue in this case.  *See* Plaintiffs' Exhibit J, pp. 1-3, 1-10 (analyzing findings and studies only up to 2016).  The EPA Report does not reference EQT in any way.  *Id.*  Importantly, the EPA Report concluded that "contamination of drinking water resources depends on **site-, chemical-, and fluid-specific factors** . . . [t]herefore, potential hazard and risk considerations are **best made on a site-specific, well-specific basis**."  *Id.*, pp. 9-82 (emphasis added).  While the EPA Report does reference a 2014 study performed in Greene County that monitored the effects of hydraulic fracturing operations at a test site, that 2014 study found "**no evidence . . . of gas or brine migration from the Marcellus Shale.**"  *Id.*, pp. 6-54 (emphasis added). Contrary to Plaintiffs' assertion that "health risks" from hydraulic fracturing fluids are "well documented," the EPA

evidence is wholly insufficient to demonstrate that Plaintiffs are likely to succeed (or could succeed at all) on their highly technical claims.  Plfs. Br. at 5-8.

Plaintiffs' claims are premised upon a complex series of scientific and medical assumptions that, as a matter of law, require expert evidence and which fail without such evidence.[14]  Indeed, a legitimate showing of causation first requires Plaintiffs to provide expert evidence demonstrating *general* causation—i.e., that EQT allegedly "released" substances into surrounding water supplies on June 19, 2022 (even though there is no evidence of such release) *and* that those substances were capable of causing Plaintiffs and other residents harm.  *See Soldo*, 244 F. Supp. 2d at 525-26; *Grine v. Coombs*, 214 F.R.D. 312, 322-24 (W.D. Pa. 2003) (discussing prior denial of preliminary mandatory injunction based on HSCA, nuisance and other tort claims for alleged water contamination where plaintiffs produced "no expert report or affidavit that would establish to a reasonable degree of scientific certainty" that defendant was "source" of alleged contamination, that allegedly hazardous substances in water supplies "would pose a danger to humans" generally, and that plaintiffs' "physical symptoms were attributable to specific hazardous substances to which

---

Report instead concluded that "the **actual health impacts** [of hydraulic fracturing] are **not well understood and not well documented**" and "a **potentially significant knowledge gap exists** with respect to the scientific community's understanding of the potential human health impacts of these [hydraulic fracturing] chemicals."  *Id.*, pp. 9-8, 9-79 (emphasis added).

[14] *See Feit v. Great W. Life & Annuity Ins. Co.*, 271 Fed. Appx. 246, 252 (3d Cir. 2008) ("[E]xpert testimony is needed to prove causation of a medical condition."); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999) (expert testimony would be "integral" and "necessary" for plaintiff to establish that defendant caused air contamination, plaintiff was exposed to such contamination and plaintiff's alleged injuries were causally connected to that purported contamination); *Soldo v. Sandoz Pharma. Corp.*, 244 F. Supp. 2d 434, 525 (W.D. Pa. 2003) ("In a case such as this one involving complex issues of causation not readily apparent to the finder of fact, plaintiff must present admissible expert testimony to carry her burden."); *see also McMunn v. Babcock & Wilcox Power Gen. Grp., Inc.*, 869 F.3d 246, 267 (3d Cir. 2017) (affirming summary judgment against plaintiffs who had alleged exposure to radioactive chemicals from defendant's facility where plaintiffs failed to provide expert evidence on whether facility had exceeded permissible radioactive thresholds in first place) ("We agree that Plaintiffs' argument . . . fails for lack of expert evidence in this highly technical area."); *Henry v. St. Croix Alumina, LLC*, 572 Fed. Appx. 114, 119 (3d Cir. 2014) (rejecting plaintiffs' contention on appeal that expert testimony was not required to prove industrial waste from defendant's refinery caused injuries, noting "[n]one of the cases cited by Appellants in support of this proposition overcome the general requirement of expert testimony on causation in a complex, toxic tort case . . . A jury could not simply intuit what caused Appellants' varying injuries here[.]").

26

they had [allegedly] been exposed"); *see also In re Zoloft Prod. Liab. Litig.*, 176 F. Supp. 3d 483, 491 (E.D. Pa. 2016) (plaintiffs cannot demonstrate causation in toxic tort context without "predicate proof of general causation"). Plaintiffs would then need to provide additional expert support demonstrating *specific* causation—i.e., that these substances actually caused the various conditions Plaintiffs now speculatively allege on behalf of themselves and other, unspecified putative class members. *See Soldo*, 244 F. Supp. 2d at 526, 567-77 (granting summary judgment where, "[i]n the absence of expert testimony, plaintiff ha[d] failed to demonstrate" that defendant product at issue "can and did cause her" alleged injuries); *see also Pluck v. BP Oil Pipeline Co.*, No. 2:09-cv-430, 2009 WL 10679556, at *3 (N.D. Ohio Nov. 25, 2009) (explaining "two-pronged" showing of general and specific causation in toxic tort case arising out of drinking water contamination and requiring expert evidence on both prongs).

In the absence of such causation evidence, Plaintiffs cannot demonstrate that they are likely to prevail on the merits so their Motion must fail. *See Grine*, 214 F.R.D. at 322-24; *City of Evanston v. N. Ill. Gas Co*., 381 F. Supp. 3d 941, 963-64 (N.D. Ill. 2019) (denying preliminary mandatory injunction for alleged soil and water main contamination where plaintiff had offered "no evidence (expert or otherwise)" supporting speculative assertion that chemicals from defendant's plant could contaminate surrounding water supplies, such that plaintiff was unlikely to prevail on merits of claim); *Manley v. Gen. Motors Corp*., NA 02-111-C-B/H, 2003 WL 1089634, at *4 (S.D. Ind. Feb. 20, 2003) (preliminary mandatory injunction based on nuisance claim for alleged chemical contamination denied where plaintiffs provided no expert evidence that "contamination of their land by PCBs released by [defendant's plant] pose[d] a dangerous threat

to [their] health" and "[g]iven the paucity of Plaintiffs' evidence, . . . the likelihood that Plaintiffs will prevail on the merits of their cases . . . is patently weak.").[15]

This is particularly true where the record before this Court—i.e., a record that only EQT has populated with scientific, expert-backed evidence—demonstrates that Plaintiffs' causation theory is speculative and entirely unfounded. *See Grine*, 214 F.R.D. at 323 (injunction denied where PADEP had "determined that there was no substantial or imminent threat to the well-being of Plaintiffs or the surrounding community" after investigating plaintiffs' allegedly contaminated water supply and nearby water supplies); *Manley*, 2003 WL 1089634, at *4 (denying injunction where plaintiffs put forth no "experts of their own" to refute defendant's extensive well-water and soil sampling indicating no contamination).[16]   Plaintiffs have presented no scientific or expert

---

[15] The cases on which Plaintiffs rely, while materially distinguishable from the facts and circumstances here, confirm this understanding. *See, e.g.*, *Boynes v. Limetree Bay Ventures LLC*, 110 F.4th 604, 609-10 (3d Cir. 2004) (affirming grant of preliminary mandatory injunction where plaintiffs had offered expert evidence demonstrating that: (1) defendants' repeat-offender refinery had likely caused contamination of water supplies through multiple oil spills; and (2) given oil's long-lasting nature, such contamination would prove injurious to health of plaintiffs and other identified residents); *Concerned Pastors for Social Action v. Khouri*, 217 F. Supp. 3d 960, 965-66 (E.D. Mich. 2016) (granting preliminary mandatory injunction where plaintiffs provided testimony from "environmental engineer with an expertise in water chemistry" that defendant city's failure to employ scientifically established methods for protecting against lead-leaching in its water system likely caused increased lead levels in public water supplies, with engineer then confirming this conclusion by examining and opining on diverse sampling data); *U.S. v. City of N. Adams*, Civ. A. No. 89-30048-F, 1992 WL 391318, at *1-2 (D. Mass. May 18, 1992) (entering post-trial permanent injunction against defendant city that had been conclusively found to have caused public water contamination where "more than ample expert testimony at trial" clarified nature of said contamination and specific health risks flowing from it); *see also Joshua Hill*, 294 F.3d at 485 (evaluating district court's bench trial decision on HSCA claim with reference to expert testimony that both parties had offered as to alleged release of hazardous substances and resultant groundwater contamination).

[16] Against this backdrop, Plaintiffs' suggestion that their two lay affidavits and medley of newspaper articles should carry the day, Plfs. Br. at 12-13, is without merit.  While some courts have relaxed evidentiary rules for the purposes of injunctive proceedings, courts do not relieve Plaintiffs of the burden of proving their claims through competent evidence.  *See Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993) ("Although the district court may employ informal procedures and rely on generally inadmissible evidence, the record must nevertheless support the district court's decision.").  Plaintiffs' "evidence" cannot lay that foundation here.  *See Grine*, 214 F.R.D. at 322-24 & n.7 (denying motion for preliminary mandatory injunction where plaintiffs, rather than presenting expert evidence, "attempted instead to provide the necessary causal links through their own personal affidavits, which contained hearsay and lay speculation about scientific matters premised on their own anecdotal observations," before relying on same materials at hearing, "proffer[ing] no expert testimony or reports to substantiate their theory" that defendants were responsible for alleged contamination and plaintiffs' physical complaints); *Manley*, 2003 WL 1089634, at *5 (denying motion for preliminary mandatory injunction where plaintiffs had "not offered evidence, other than their own testimony," that they would suffer irreparable harm in absence of injunctive relief).

evidence, let alone evidence sufficient to satisfy their heavy burden required to obtain a mandatory preliminary injunction.[17]  EQT's experts have evaluated EQT's operations, the Fox Hill Event, geology, monitoring data, water quality data, water level data, gas chemistry data and scientific literature, all of which demonstrate that Plaintiffs' claims lack merit.  *See* Section II(E), (F), *supra*. PADEP independently determined that there was no evidence of any impact to water supplies from EQT's operations.  Ex. 7 (compilation of PADEP determination letters).

In short, the complete lack of credible causation evidence from Plaintiffs, when compared with EQT's robust evidentiary proof which establishes no causation at all, demonstrates that Plaintiffs cannot prevail on the merits of their underlying claims.  Plaintiffs' Motion should be denied on this ground alone.

> 2. **In addition to their lack of causation proof, Plaintiffs' claims are unlikely to prevail on the merits because they cannot establish the elements of their underlying claims**

As set forth in additional detail in EQT's Motion to Dismiss (ECF Nos. 32-33), Plaintiffs' HSCA claim fails because they do not present evidence that there was a release or threatened release of hazardous substances into the ground water.  To subject a site owner or operator to liability under HSCA, a plaintiff must prove, in part, that "there has been an actual or threatened release of a hazardous substance from a site."  *See Joshua Hill*, 294 F.3d at 485; *see also* 35 P.S. § 6020.702; 35 P.S. § 6020.103 (defining the terms "release" and "hazardous substance").

Moreover, Plaintiffs' requested injunctive relief is not an available remedy under HSCA. HSCA provides private parties with a restitutional remedy, and the statute is written in the past

---

[17] Although HSCA creates a rebuttable presumption that a person who causes or allows the release of a hazardous substance shall be liable, without proof of fault, negligence, or causation, for all damages, contamination or pollution within 2,500 feet of the perimeter of the area where the release has occurred, not only is there no credible evidence that EQT has released a hazardous substance, but this presumption may be overcome by clear and convincing evidence that the person so charged did not contribute to the damage, contamination or pollution.  35 Pa. C.S. § 6020.1109.

tense; Plaintiffs must first incur eligible response costs to respond to an environmental hazard before a private cause of action arises. *See* 35 P.S. § 6020.702(a)(3); *Atlantic Holdings Ltd. v. Apollo Metals, Ltd.*, No. 16-cv-6247, 2019 WL 1574313, at *11 (E.D. Pa. Apr. 10, 2019) (summary judgment granted to defendant where plaintiff did not incur costs to contain and clean up hazardous substances). Plaintiffs' replacement water supplies on a going-forward basis are outside the statute's scope of liability because the "response costs" Plaintiffs seek through their injunction have not yet been incurred and have not endured scrutiny from this Court under HSCA's "reasonable and necessary or appropriate" standard. 35 P.S. § 6020.702(a)(3).[18] In addition, HSCA does not authorize private parties, like Plaintiffs, to seek injunctive relief at all. 35 P.S. § 6020.1103(a); *See, e.g.*, *General Electric Env't Servs., Inc. v. Envirotech Corp.*, 763 F. Supp. 113, 116, n.2 (M.D. Pa. 1991) (the Pennsylvania General Assembly "desired to limit the scope of" Section 1103 injunction suits to PADEP (then known as DER) actions only and "inserted language to that effect" in the provision); *D.L. Martin Mach. Co. v. Loewengart & Co.,* 20 Pa. D. & C.4th 520, 524 (Com. Pl. – Franklin Cty. 1992) (same). Plaintiffs' requested injunctive relief is therefore not available under HSCA.

In addition, Plaintiffs are not likely to succeed on the merits of their negligence and nuisance claims. As set forth in more detail in EQT's Motion to Dismiss (ECF Nos. 32-33), Plaintiffs' negligence and nuisance claims are barred by a two-year statute of limitations under Pennsylvania law. *See* 42 Pa.C.S.A. § 5524 (negligence); *Caruso-Long v. Reccek*, 243 A.3d 234, 239 (Pa. Super. Ct. 2020) (nuisance). These causes of action accrue, and the two-year limitations

---

[18] Response costs must be reasonable and necessary or appropriate, and they must be incurred to meet legally applicable or relevant and appropriate, cost effective cleanup standards. 35 P.S. § 6020.504(a); *Young v. U.S.*, 394 F.3d 858, 863 (10th Cir. 2005) (a response cost is only necessary if it is closely tied to the actual cleanup of hazardous substances; affirming summary judgment for defendant). Plaintiffs in effect are asking the Court to prospectively declare their future response costs reasonable and necessary or appropriate. This is improper.

period begins to run, when the defendant's alleged conduct gives rise to the injuries they contemplate.  *See Bigansky v. Thomas Jefferson Univ. Hosp.*, 658 A.2d 423, 426 (Pa. Super. Ct. 1995) ("[T]he statute of limitations for a negligence cause of action is triggered upon the occurrence of a breach of duty."); *Reccek*, 243 A.3d at 239 (two-year statute of limitations generally begins to run on nuisance claims at time of original nuisance).[19]  Because Plaintiffs' two-year window to bring negligence and nuisance claims expired on June 19, 2024, their claims, brought on June 20, 2024, are time-barred.  *See* Def. Br. In Support of Motion to Dismiss, ECF No. 32, at pp. 7-11.

> **3.    Plaintiffs' claims are unlikely to prevail on the merits because their claims are barred by administrative finality doctrines.**

Plaintiffs' Motion also independently fails because Plaintiffs Hice and Moore did not exhaust available administrative remedies designed by the Pennsylvania legislature to address the very harm alleged in Plaintiffs' Motion.  Under the Pennsylvania Oil and Gas Act, landowners may request a water quality investigation by PADEP if they believe their water supply has been impacted by oil and gas operations.  58 Pa. C.S. § 3218(a-b).  If PADEP concludes from its investigation that a landowner's complaint is legitimate, then PADEP must require that a well operator like EQT "restore or replace the affected [water] supply with an alternate source of water adequate in quantity or quality for the purposes served by the supply."  *Id*.  If, on the other hand, PADEP's investigation rejects the landowner's complaint, then the landowner has a statutory right of appeal to the Pennsylvania EHB.  *See Kiskadden v. Com.*, EHB Docket No. 2011-149-R, 2012

---

[19] Plaintiffs' nuisance claim is a permanent nuisance under Pennsylvania law.  *See, e.g.*, *F.P. Woll & Co. v. Fifth & Mitchell St. Corp.*, 326 Fed. Appx. 658, 662 (3d Cir. 2009); *Russell v. Chesapeake Appalachia, L.L.C.*, No. 4:14-cv-148, 2018 WL 6804764, at *7 (M.D. Pa. Dec. 27, 2018); *Degussa Constr. Chem. Ops., Inc. v. Berwind Corp.*, 280 F. Supp. 2d 393, 408 (E.D. Pa. 2003); *Warminster Tp. Mun. Auth. v. U.S.*, 903 F. Supp. 847, 849, 851 (E.D. Pa. 1995); *Graham Oil Co. v. BP Oil Co.*, 885 F. Supp. 716, 727 (W.D. Pa. 1994).

WL 1981287, at *9 (Pa. Env. Hrg. Bd. May 16, 2012); *see also* Environmental Hearing Board Act, 35 P.S. §7514 and the Administrative Agency Law, 2 Pa.C.S. Chapter 5A.

When PADEP makes a decision that is not appealed by a party to the EHB, that PADEP decision becomes final and is binding. *See Otte v. Covington Tp. Road Sup'rs,* 650 A.2d 412, 414-415 (Pa. 1994); *Exeter Township, Berks County, Authority v. Commonwealth of Pennsylvania, Dept. of Environmental Protection,* EHB Docket No. 98-154-C, 2001 WL 681287, at *6 (Pa. Env. Hrg. Bd. May 30, 2001). There were water supply complaints submitted to PADEP that resulted in water supply investigations under 58 Pa. C.S. § 3218(b). In each case, the demand was either withdrawn or, after a completed PADEP investigation, determined to be unsubstantiated (i.*e.,* a negative determination), which included investigations of the water supplies of named plaintiffs David Hice and Joseph Moore. *See* Ex. 7, pp. 172, 216.

In his affidavit, Mr. Hice states that he reported his water supply complaint to the PADEP on August 24, 2022 (the "Hice Claim"), which tested his water the same day. ECF No. 23-15 at ¶ 8. Mr. Hice claims that other than an October 2022 letter indicating further investigation was necessary, "I have not received an update from the PA DEP on the conclusion of their investigation." *Id.* However, Mr. Hice received from PADEP a negative determination of his claim in June 2023. *See* Ex. 7, p. 216 (June 13, 2023 letter from PADEP to Mr. Hice) (stating, "[t]he Department has completed its investigation of your water supply . . . [b]ased on the sample results and other information obtained to date, the Department cannot conclude that the Water Supply was adversely affected by oil and gas activities" (the "Hice Negative Determination")). The Hice Negative Determination provided Mr. Hice with EHB appeal rights and deadlines, which were specified in the June 2023 Letter. *Id.* at p. 217. Mr. Hice did not appeal the Hice Negative

Determination to the EHB and the thirty (30) day appeal deadline to do so has long since expired.[20] The appeal deadline has also passed for each of the complainants who also received negative determinations from the PADEP and who may be members of plaintiffs' putative class.  *See* Ex. 7 (summary chart of PADEP determinations).[21]

The PADEP determinations that the water supplies of Mr. Hice and Mr. Moore (as well as the unidentified claimants who received negative determinations) were not negatively impacted by oil and gas activities are final and binding, as those determinations were not timely appealed to the EHB.  These unidentified landowners are therefore precluded from collaterally challenging the PADEP negative determinations regarding their water supplies by filing a separate judicial proceeding in this Court.  *See Lamolinara v. Commonwealth, Pennsylvania State Police,* 414 A.2d 1126, 1129 (Pa. Commw. 1980) *aff'd* 410 A.2d 1154 ("the failure of this petitioner to take a timely appeal from the agency action complained of also precludes collateral attack on that same action by resort to our original jurisdiction."); *Lucchino v. Commonwealth of Pennsylvania, Department of Environmental Protection,* EHB Docket No. 98-166-R, 1999 WL 349637, at *4 (Pa. Env. Hrg. Bd. May 10, 1999) ("Where a party is aggrieved by an administrative action of the [PADEP] and fails to pursue his statutory appeal rights, neither the content nor the validity of either the [PADEP's] action or the regulation underlying it may be attacked in a subsequent . . . judicial proceeding"); *see also Doheny v. Com.,* 171 A.3d 930, 935 (Pa. Commw. 2017) (petitioner's failure

---

[20] PADEP also sent a June 13, 2023 letter to Mr. Moore providing a negative determination as to his water supply complaint (the "Moore Negative Determination").  *See* Ex. 7, p. 172.  Mr. Moore did not appeal the Moore Negative Determination to the EHB and the thirty (30) day appeal deadline to do so has long since expired.  *See* EHB Docket screenshots for searches of "Hice" and "Moore" attached hereto as **Exhibit 9**, which reveal that there have been no EHB appeals filed by Messrs. Hice or Moore.

[21] Although Mr. Yoders' claim appears to still be under investigation with the PADEP, Moody has assessed his water supply and determined that there has been no impact by EQT's operations.  *See* Section II(E)(2), *supra.*

to timely appeal the final administrative decisions which gave rise to the action precludes him from bringing any court action to challenge the effects of the administrative decisions).

The administrative finality doctrines prohibit Plaintiffs' attempted end-run around the statutorily and administratively prescribed water supply complaint process, and PADEP's factual findings and conclusions are uncontestable. *See Kresge & Sons, Inc. v. Commonwealth of Pennsylvania, Department of Environmental Protection,* EHB Docket No. 99-149-K, 2000 WL 143641, at *9-10 (Pa. Env. Hrg. Bd. Jan. 27, 2000).

### C. Plaintiffs cannot demonstrate immediate and irreparable harm.

Plaintiffs' Motion also fails because they cannot meet their equally elevated burden of demonstrating immediate and irreparable harm, either by Plaintiffs individually or on behalf of the unidentified members of the putative class. *See Dunmore Sch. Dist. v. Pa. Interscholastic Ath. Ass'n,* 505 F. Supp. 3d 447, 456 (M.D. Pa. 2020) (petitioners for mandatory injunctive relief "must meet a higher standard of showing irreparable harm in the absence of an injunction, as mandatory injunctions are generally disfavored.") (quoting, in part, *Bennington Foods LLC v. St. Croix Renaissance, Grp*., *LLP*, 528 F.3d 176, 179 (3d Cir. 2008)); *see also Adams*, 204 F.3d at 485-91 & n. 10. Plaintiffs bear the burden of making a "clear showing of immediate irreparable injury" in the absence of injunctive relief. *See ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987); *see also Winter*, 555 U.S. at 22 ("[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction.") (emphasis original).

### 1. Plaintiffs cannot demonstrate immediate and irreparable harm on behalf of themselves, their affiants or their putative class.

Neither Plaintiffs nor their affiants can reasonably claim immediate and irreparable harm *where the evidence demonstrates no impact to their water supplies and they are presently receiving alternative water supplies from EQT*. *See* Ex. 7 (compilation of PADEP determination letters).

While Plaintiffs rely on speculation, EQT presents four scientific experts and PADEP determinations that specifically evaluated Mr. Hice and Mr. Yoders' claims. Mr. Hice filed a complaint with the PADEP regarding his water supply and received a negative determination from the PADEP in June 2023. *See id.* at p. 216. Moody took three samples each (six total) from Mr. Yoders' water wells on June 22, 2022, June 30, 2022, and April 6, 2023 and likewise concluded "that there has been no impact to water supplies from the hydraulic stimulation of [] Lumber 13H or any other wells on the Lumber [Well Site] or from the June 19, 2022 event at the Fox Hill 1 conventional well." Ex. 1, Bobrzynski Aff. at Ex. C, p. 1. Nevertheless, Mr. Hice and Mr. Yoders are already receiving the relief being requested—each has a water buffalo on their property and receive water deliveries from EQT. *See* Hice Aff. ¶ 14-16, ECF No. 23-15; Yoders Aff. ¶¶ 17-19, ECF No. 23-16. Neither of these individuals can claim immediate and irreparable harm.

This leaves Plaintiffs purporting to establish these alleged harms on behalf of an unknown yet sprawling putative class. But Plaintiffs have offered no evidence (expert or otherwise) to directly link these harms to any specific member of the putative class, as this Circuit requires. *See Adams*, 204 F.3d at 485-92 (vacating mandatory preliminary injunction for putative class where named plaintiffs had only offered lay testimony as to their own alleged injuries and had offered no evidence demonstrating that putative class members were similarly situated, thereby frustrating legitimate inquiry into whether these members were "specifically and personally" suffering irreparable harm). To the contrary, Plaintiffs purport to graft these multiple harms onto a larger, anonymous population by offering only speculative assertions of two community members who not only fail to identify any specific putative class member allegedly suffering harm, but are not suffering any harm themselves since they are receiving alternate water. *See* ECF No. 23-15 and

ECF No. 23-16.[22]  There are not sufficient facts to establish immediate and irreparable harm.  *See Adams*, 204 F.3d at 485-92.

Moreover, Plaintiffs offer no evidence that the unknown individuals in the community want the requested relief.  *See* Ex. 1, Bobrzynski Aff. at Ex. B (discussing numerous individuals in the putative class area that *did not* respond and/or *did not* want their water tested).  And even if the affiants could demonstrate that their own water was impacted (and they did not), this would not establish an impact to any other individuals' water supplies given the individualized nature of each inquiry.  *See* Ex. 4, Saba Aff. at Ex. B, pp. 11-19; *see also* Ex. 7 (compilation of PADEP determination letters showing consistent determinations that no impact occurred to the community members, demonstrating no harm at all).  Individual property owner claims must be evaluated on an individualized basis, which Plaintiffs have not done.  *See* Ex. 4, Saba Aff. at Ex. B, p. 11.[23]  For example, the presence of gases and dissolved compounds can vary significantly from one well to another, with factors influencing variability including topography, surface water features, lithology, and surface activity and land use.  *Id.*  Thus, Plaintiffs' attempt to obtain mass injunctive relief against EQT on the basis of "harms" that Plaintiffs have not specifically or personally tied to any putative member (or any individual) should be rejected.  *See Adams*, 204 F.3d at 487 (a

---

[22] As mentioned, Plaintiffs contend that their alleged classwide irreparable harms should turn on the respective financial conditions of putative members who purportedly cannot afford alternative water supplies (i.e., members that Plaintiffs have failed to identify).  *See* Pltf. Br. at 23.  But this too would require an individualized, expert-backed showing, which Plaintiffs have not made.  *See Boynes*, 110 F.4th at 609-10 (after consulting "expert reports, models, and extensive data," finding irreparable harm for only those identifiable "residents [who] could not afford to buy clean water" and who qualified for "need-based government financial assistance.").

[23] PADEP also investigates each water inquiry on an individualized basis.  *See, e.g.* 58 Pa. C.S. § 3218(a-b); Ex. 7 (compilation of PADEP determination letters for individual landowners).

court cannot enter a mass preliminary injunction "in the absence of a foundation from which [it] could infer that all (or virtually all) members of a group are irreparably harmed.").[24]

### 2. Plaintiffs cannot demonstrate immediate and irreparable harm where any assertion of "immediacy" is undercut by their own delay in bringing the Motion.

Notwithstanding that Plaintiffs cannot establish purported harms on behalf of themselves and unidentified "affected residents," Plaintiffs' unexplained delay in waiting more than two years since the June 19, 2022 alleged communication event, more than two months after filing this suit, and more than a month after threatening an injunction before filing the Motion disproves their allegations that there is urgent irreparable injury that this Court must address preliminarily. As the Third Circuit has observed, since preliminary injunctions are traditionally "granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights," a movant's "[d]elay in seeking enforcement of those rights" indicates a "reduced need for such drastic, speedy action." *Lanin v. Borough of Tenafly*, 515 Fed. Appx. 114, 117-18 (3d Cir. 2013) (quoting *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir. 1985) (two-year delay in moving for a preliminary injunction was "sufficient proof" that no risk of immediate irreparable harm was present)). Despite this commonsense injunctive principle, Plaintiffs' Motion is silent on why Plaintiffs stalled for over two years while they and supposedly hundreds of residents suffered alleged harm in the midst of what Plaintiffs now say is a "water crisis." *See* Plfs. Br. at 1. Courts

---

[24] The cases Plaintiffs offer in support of the generalized theory that a lack of access to safe drinking water constitutes an irreparable harm, *see* Plfs. Br. at 22, do not help them. Unlike here, those cases involved primarily municipal defendants who had, in blatant violation of federal statutes and in the face of aggressive regulatory intervention, systemically caused—and either conceded or failed to disprove—large-scale contamination of water supplies. *See generally Boynes*, 110 F.4th 604 (refinery oil contamination of island cisterns); *Khouri*, 217 F. Supp. 3d 960 (lead contamination of public water system); *City of N. Adams*, 1992 WL 391318 (bacterial contamination of public water system). Confronted with proven contamination, and with the aid of expert input, the courts there had little difficulty concluding that the plaintiffs were likely to suffer irreparable injury in the absence of injunctive relief against the clearly responsible defendants. *Id.* Those facts and elements do not exist here.

in this Circuit have routinely held that this type of delay precludes a finding of irreparable harm for the purposes of preliminary injunctive relief.[25]  As such, Plaintiffs' already flawed assertions of irreparable harm to this Court lack immediacy and merit.

### 3.    Plaintiffs cannot demonstrate immediate and irreparable harm where they and "affected residents" can be compensated through money damages.

Plaintiffs' claims of immediate and irreparable harm finally fail where, as Plaintiffs admit, they and the putative class can be compensated for such harms (assuming their existence) through money damages.  In order to be entitled to injunctive relief, Plaintiffs must also "articulate and adduce proof" showing that their claimed water contamination harms "cannot otherwise be compensated by money damages."  *Kamdem-Ouaffo v. Task Mgmt. Inc*, 792 Fed. Appx. 218, 221 (3d Cir. 2019) (internal quotation marks omitted); *see also Adams*, 204 F.3d at 484-85 (irreparable harm requirement is only met "if a plaintiff demonstrates a significant risk that he or she will

---

[25] *See, e.g.*, *Lanin*, 515 Fed. Appx at 118 (a two-year delay in moving for a preliminary injunction was "sufficient proof" that no risk of immediate irreparable harm was present); *Smart Commc'ns Holding, Inc. v. Global Tel-Link Corp.*, No. 1:21-CV-01708, 2022 WL 1049319, at *7 (M.D. Pa. Apr. 7, 2022) ("a delay of almost nine months in bringing this lawsuit and a delay of almost 13 months from the underlying conduct before the request for injunctive relief was made" were too extensive to show irreparable harm where "notably absent from the reply brief [was] any explanation for the delay"); *Am. Hypnotherapy Soc'y, LLC v. ABC Cap. Invest., LLC*, No. 19-6116, 2020 WL 8116165, at *1 n.1 (E.D. Pa. July 7, 2020) (rejecting request for preliminary injunction where the plaintiffs did "not explain their apparent delay" of three years in filing suit and of an additional six months "in seeking equitable relief for what they purportedly believe is imminent irreparable harm"); *Rogers v. Gentex Corp.*, No. 3:16-CV-00137, 2016 WL 4708004 at *14 n.2 (M.D. Pa. Sep. 8, 2016) (a six-month delay between filing the complaint and moving for preliminary injunctive relief factored against a finding of irreparable harm); *Profoot, Inc. v. MSD Consumer Care, Inc.*, No. 11-7079, 2012 WL 2262904 (D.N.J. June 14, 2012) (finding no irreparable harm due to a three-month delay in moving for a preliminary injunction); *Pharmacia Corp. v. Alcon Labs, Inc.*, 201 F. Supp. 2d 335, 383-84 (D.N.J. 2002) (a one-year delay "knock[ed] the bottom out of any claim of immediate and irreparable harm"); *New Dana Perfumes Corp. v. The Disney Store, Inc.*, 131 F. Supp. 2d 616, 630 (M.D. Pa. 2001) ("In this case, there is an unexplained delay of two months in presenting a cease and desist letter, and another unexplained delay of five months in moving for injunctive relief. Under the circumstances, plaintiffs' delay, alone, precludes a finding of irreparable harm, and therefore warrants denial of the preliminary injunction motion . . . ."); *Orson, Inc. v. Miramax Film Corp.*, 836 F. Supp. 309, 312-13 (E.D. Pa. 1993) ("Clearly plaintiff's own [50-day] delay in filing the motion shows that irreparable harm . . . is not imminent as is required for a preliminary injunction."); *Skehan v. Bd. of Tr. of Bloomsburg State Coll.*, 353 F. Supp. 542, 543 (M.D. Pa. 1973) (because "Plaintiff did not file this action until nearly two years after the events which gave rise to his complaints," relief was denied because a "preliminary injunction is based upon an urgent need for the protection of Plaintiff's rights, [and] a long delay in seeking relief indicates that speedy action is not required").

experience harm that cannot adequately be compensated after the fact by monetary damages."). "This is not an easy burden." *Adams*, 204 F.3d at 485.

Plaintiffs cannot meet this difficult burden when they have already conceded in their Complaint that they can be adequately compensated through money damages for pursuing the same relief they now seek in their Motion. *See, e.g.*, Compl. ¶¶ 93, 98, 129, 148 (seeking money damages for costs of obtaining alternative water supplies and "expenses related to remedial measures taken to ensure safe and clean . . . water" and further seeking statutory recovery of allegedly incurred HSCA response costs, including replacement water). Although EQT contends that Plaintiffs' putative class action is meritless and that there is neither causation nor harm, Plaintiffs' own inconsistent assertions that adequate monetary damages should be available in this lawsuit further confirm the Court's inquiry into the question of irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").[26]

### D. While the Court need not analyze the remaining injunctive elements, they nevertheless do not bend in Plaintiffs' favor.

Because Plaintiffs have failed to carry their "heavy burden" of meeting the two "most critical" factors of mandatory preliminary injunctive relief here, the Court's inquiry can, and should, end there.[27]  *See Acierno*, 40 F.3d at 653; *Reilly*, 858 F.3d at 179; *Adams*, 204 F.3d at 484.

---

[26] Plaintiffs' contradictory positions before the Court in this regard further ignore a "basic tent of equity jurisprudence: if an adequate remedy at law exists, equitable relief will not be granted." *Goadby v. Phila Elec. Co.*, 629 F.2d 117, 122 (3d Cir. 1981).  If, as Plaintiffs concede, the law affords them and "affected residents" an adequate pathway to relief, that is the course they must pursue, not a belated and groundless motion for an extraordinary mandatory injunction. *TD Bank N.A. v. Hill*, 928 F.3d 259, 282 (3d Cir. 2019) ("But where an adequate remedy at law exists, the party seeking redress *must* pursue it.") (internal quotation marks omitted, emphasis original).

[27] Not only have Plaintiffs failed to meet their burden for injunctive relief, but Plaintiffs' proposed order is also insufficiently specific.  Pursuant to Rule 65, "[e]very order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms **specifically**; and (C) **describe in reasonable detail**—and not by referring to the complaint

Nevertheless, Plaintiffs similarly fail to show that a balancing of harms and the public interest weigh in favor of their extraordinary request for mandatory injunctive relief.

A balancing of harms tips sharply in EQT's favor. *See Punnett v. Carter*, 621 F.2d 578, 587-88 (3d Cir. 1980) ("[W]hen the preliminary injunction provides for mandatory relief, it is particularly appropriate to weigh the possible harm to other interested parties."). Plaintiffs should not be permitted to subject EQT to extraordinary relief—through a widespread water distribution and informational program—after coming to this Court with nothing more than pure speculation about causation and no immediate and irreparable harm. *See Grine*, 214 F.R.D. at 324 (denying mandatory preliminary injunction in water contamination case upon finding, in part, that defendants would "suffer irreparable harm if forced to undertake a variety of remedial measures based on Plaintiffs' speculative injuries, particularly where the source of Plaintiffs' injuries remained uncertain."). Ignoring this, Plaintiffs simply contend that their contemplated injunction would amount to a "self-inflicted" and "minimal" burden for EQT, *see* Plfs. Br. at 25, offering no evidence in support of this disingenuous position and making no effort to quantify that burden.[28]

---

or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d) (emphasis added). "[T]he specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Plaintiffs' vague request does not satisfy Rule 65. First, Plaintiffs ask this Court to order EQT to submit a plan to "provide **affected residents** reliable access to safe drinking water," yet Plaintiffs fail to provide any details—such as names and address of the allegedly affected residents or which specific water supplies are allegedly affected—about what this means. Plfs. Br. at 29 (emphasis added). Similarly, Plaintiffs' proposed "informational mailer" suffers from the same problem, as it requests that EQT provide "**adequate information** about potential water contamination" to residents. *Id.* (emphasis added). Notwithstanding that the scientific evidence shows that EQT has not caused any water contamination, the "adequate" standard is vague and lacks a clear directive as to what is required in order to comply with the proposed order.

[28] Instead, Plaintiffs rely on a series of inapt cases. *See U.S. v. Alisal Water Corp.*, 431 F.3d 643 (9th Cir. 2005) (finding that water system conglomerate's alleged harm in being forced to divest assets after it was conclusively found to have committed "numerous and significant" regulatory violations could not outweigh public harm associated with conglomerate's contamination of drinking water); *U.S. v. Edward Rose & Sons*, 384 F.3d 258 (6th Cir. 2004) (defendants "voluntarily incurred" costs of complying with preliminary injunction after U.S. warned them that their apartment designs would violate FHA and defendants proceeded with construction anyway).

Rather, compelling EQT to undertake an expansive remedial program to an unidentified number of residents in two townships in response to a nonexistent "water crisis" could impose a substantial burden on EQT.  Given the gaping holes in Plaintiffs' Motion, the equities do not favor them.

Nor does the public interest call for an injunction under the facts and circumstances of this case.  No doubt that there is generalized public interest in clean water, *see* Plfs. Br. at 26-27, but the evidence shows that EQT's operations did not impact the water supplies at issue.  Prematurely forcing oil and gas companies to engage in loosely defined public water supply projects when, as here, there is no indication of liability, is not in the public interest.  *See Maldonado-Gonzalez v. Puerto Rico Aqueducts & Sewer Auth.*, No. CV 22-1250 (RAM), 2022 WL 2106383, at *1 (D.P.R. June 10, 2022) (denying request for injunction ordering defendants to continuously provide adequate water service because such affirmative relief would change status quo and amount to determination on the merits).  Likewise, forcing companies to publicize claims of mass water contamination when the claims are based on mere speculation rather than any quantum of scientific evidence is not in the public interest.[29]  Nor is allowing Plaintiffs to seek to exploit EQT's good-faith attempts to acknowledge public concerns by voluntarily providing alternative water supplies (despite having no obligation to do so).  Plaintiffs' Motion fails to satisfy any of the elements necessary to issue the kind of extraordinary relief Plaintiffs seek.[30]

---

[29] Plaintiffs' Motion should not be used to unjustifiably arouse public fear in order to conjure interest in this case.  *See, e.g.*, *New Freeport Residents in Court Demanding Clean Water From EQT*, PublicSource (Sept. 10, 2024), available at:   https://www.publicsource.org/new-freeport-eqt-class-action-lawsuit-injunction-clean-water-pennsylvania/ (quoting Plaintiffs' counsel dubbing this "a clear issue of public health and safety").

[30]  Plaintiffs' unsupported argument that they should be immune from Fed. R. Civ. P. 65's bonding requirements lacks merit.  *See* Plfs. Br. at 28-29.  "[I]nstances in which a bond may not be required" under Rule 65(c) "are so rare that the requirement is almost mandatory."  *See Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010); *see also Boynes*, 110 F.4th at 611 (the purpose of injunction bonds is to provide a fund to compensate defendants mistakenly enjoined and force plaintiffs to think carefully before accepting interlocutory relief).  Plaintiffs offer no evidence in support of this extraordinary position, and the limited cases they cite are inapposite.  *See Temple Univ. v. White*, 941 F.2d 201 (3d Cir. 1991) (waiving injunction bond requirements under narrowly drawn circumstances involving emergency relief to hospital on the brink of financial ruin that would become insolvent without the relief

## IV.    CONCLUSION

For the foregoing reasons, EQT respectfully requests that this Court deny Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted,

Date: September 20, 2024

_____
Mark K. Dausch, Esquire
PA I.D. # 205621
Carla M. Castello, Esquire
PA I.D. # 326808
James V. Corbelli, Esquire
PA I.D. # 56671
Andrew C. DeGory, Esquire
PA I.D. # 327838
**Babst, Calland, Clements & Zomnir, P.C.**
Two Gateway Center, 6th Floor
603 Stanwix Street
Pittsburgh, PA 15222
(412) 394-5400 – Phone
mdausch@babstcalland.com
ccastello@babstcalland.com
jcorbelli@babstcalland.com
adegory@babstcalland.com
*Counsel for Defendants, EQT Corporation and EQT Production Company*

---

ordered and no risk to defendant); *McCormack v. Twp. of Clinton*, 872 F. Supp. 1320 (D.N.J. 1994) (finding anything other than nominal bond for pro se plaintiff in First Amendment political speech case would impose "severe hardship" on plaintiff with no corresponding financial hardship to township). Plaintiffs were "expected to," but did not, arrange a bond at the time the motion was filed. *See* Practices and Procedures of Judge W. Scott Hardy, available at https://www.pawd.uscourts.gov/sites/pawd/files/Practices_Procedures_Judge_Hardy_10_21.pdf.

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing ***Brief in Opposition to Plaintiffs'***

***Motion for Preliminary Injunction*** was served upon all counsel of record via the Court's

electronic filing system on the 20th day of September, 2024.


_____

Mark K. Dausch, Esquire